Brick's Estate.

In Geraud *a.* Stagg (1855, 10 *How. Pr.*, 369), this whole question—on the other branch of the case, as to parties—is learnedly and ably discussed by Justice Woodruff, then of the N. Y. Common Pleas; and he comes to the conclusion that a judgment may be reversed as to one defendant and affirmed as to another, and that the Code of Procedure has changed the former rule on this subject.

I think the present case was appropriately disposed of by the Ulster County Court, and that the judgment of that court should be affirmed. Order accordingly.

---

## BRICK'S ESTATE.

*Surrogate's Court, City and County of New York; Nov.,* 1862.

SURROGATES' COURTS, THEIR HISTORY AND JURISDICTION.—GUAR-
DIANSHIP, HOW AFFECTED BY WARD'S MARRIAGE.—SURROGATE'S
POWER TO OPEN DECREE.—SERVICE OF CITATION ON INFANT.—
GUARDIAN AD LITEM, HOW APPOINTED.—PRESUMPTION AS TO
REGULARITY OF APPOINTMENT.—ACCOUNTING OF EXECUTOR, ETC.,
HOW FAR CONCLUSIVE.—INFANTS BOUND BY ACCOUNTING IN SUR-
ROGATE'S COURT.—FRAUD AND MISTAKE AS A GROUND OF OPEN-
ING SURROGATE'S DECREE.

The marriage of a female ward terminates the guardianship; though it is other-
wise of the marriage of a male ward.

Hence, after the marriage of a female ward she may appear, in a proceeding be-
fore the surrogate, without such guardian.

History of the Surrogates' Courts, and the courts which formerly possessed their
powers, in this State, traced from the earliest period.

The powers which Surrogates' Courts possessed before the enactment of the Re-
vised Statutes, and which are continued by the provisions of 2 Rev. Stat.,
220; as amended by the Laws of 1837, 536, ch. 460, § 71,—enumerated.

Though the surrogates have power, of necessity, in the administration of justice,
to undo what they have been induced to do through fraud, or upon the suppo-
sition that they had jurisdiction, or on the assumption that a party was dead
who is living, or that there was no will; and may open decrees taken by de-
fault, or correct mistakes, the result of oversight or accident; and, in this State,
may revoke the probate of wills or letters of administration, or of guardianship

in the cases provided for by the statute; yet where all the parties in interest were represented at the hearing, and the court has given its final sentence or decree, it has not the general power of opening and reversing it again, upon the ground that it had erred as to the law, or had decided erroneously upon the facts.

Service of a citation to a ward to attend an accounting of the executor before the surrogate, is properly made by delivering it to the ward personally in the presence of the ward's legal guardian.

If the guardian has an interest adverse to the ward, a special guardian may be appointed.

Even if the service or the citation were defective, the ward's actual appearance, pursuant to it, before the surrogate, gives him jurisdiction to appoint such special guardian.

The surrogate has power to appoint a special guardian, or guardian *ad litem*, for a minor, though over fourteen years of age, without the consent of the minor. This power is incident to every court of justice, whether of inferior or general jurisdiction; and it is recognized, in the case of surrogates, by 2 Rev. Stat., 220, § 1, subd. 7, and the act of 1787. The provision of 2 Rev. Stat., 150,—which requires the ward's consent,—relates only to the appointment of general guardians.

In the absence of evidence to the contrary, the regularity of the appointment of a guardian *ad litem* is to be presumed.

Although the provision of 2 Rev. Stat., 94, § 65, declares a final accounting of an executor or administrator conclusive as to certain specified matters, in all tribunals, it is still conclusive in the Surrogate's Court, as to all other matters, so far at least as to the right to compel a further account.

Such an accounting is as conclusive against infants, as it is against other parties. Ecclesiastical or Surrogates' Courts have not power, unless it is conferred by statute, to open a decree affecting an infant, after the infant attains majority. It is only in case of bad faith on the part of the guardian *ad litem* or executor, or fraud or surprise upon the court, that the infant is entitled to have such decree set aside.

Where an application on behalf of an infant to open a final accounting, and have a reaccounting, was made, but not chiefly on the ground of fraud, and the application was not sustained on the other grounds, and the evidence of fraud slight;—*Held*, that it should be denied without prejudice to a renewal on further evidence of fraud.

Petition to open a final accounting of the executor of the estate of Joseph W. Brick, and for a further account.

The facts, so far as material to the questions determined, are stated in the opinion.

*Mr. Stoutenburgh*, and *Murray Hoffman*, and *Richard O'Gorman*, for the petitioner.

*Cummins, Alexander & Green*, and *Lewis B. Woodruff*, opposed.

DALY, First Judge of the Court of Common Pleas, Acting Surrogate.*—This is an application, on behalf of an infant devisee of the testator, to open a decree made by the late surrogate upon a final accounting of the acting executor, upon the ground that many unjust and illegal charges were allowed, to the detriment and injury of the petitioner.

The petitioner, who has not yet attained her majority, is a married woman. She was a daughter of the testator, and her mother was appointed by the will her testamentary guardian. An objection is taken that this application must be made by her guardian and not by herself, while on her part it is insisted that her marriage determined and put an end to the testamentary guardianship of her mother.

In several parts of England the marriage of a female, by local usage, terminated her guardianship (*Bohun's Customs of London*, 315; Wilkinson *a.* Bolton, 1 *Lev.*, 162; S. C., 1 *Sid.*, 250; *T. Ray*, 116), and a provision to the like effect was incorporated in our colonial statute (*Act of* 1692, *Laws of N. Y.*, Smith & Liv. ed., 15), but at first the courts were unwilling to recognize it as a general rule.

It is said in Rolle's Abridgment (1 *Rolle*, 288), that if baron and feme suffer a common recovery, and appear by attorney, the feme being under age, it is in error, for she should appear by guardian; but the point was doubted by two of the judges.

In Freeman *a.* Biddington (*Vent.*, 185; 2 *Lev.*, 38; 2 *Keble*, 878), which was an action of assumpsit against baron and feme on a contract for wares by the feme *dum sola*, in which they both appeared by attorney, it was held after judgment by two of the judges, that it was error,—that the wife should have appeared by guardian.

But in a later case (Mendes *a.* Mendes, 1 *Ves. Sen.*, 90), it was held, by a very great authority, Lord Hardwicke, that though the marriage of a male ward did not determine the guardianship, the marriage of a female ward did, and he declared that it was so adjudged in the case of Lord Shaftesbury; and again in Roach *a.* Garvan (1 *Ves. Sen.*, 159), he declared that the court would not appoint a guardian after marriage.

---

* During a vacancy in the office of surrogate, the Hon. Charles P. Daly, First Judge of the New York Common Pleas, discharged the duties of the office.

These two latter cases are referred to by Macpherson in his work on Infants (p. 90), as authority for the rule that testamentary guardianship is not determined by the marriage of a male ward, but that the guardianship of females is determined by their marriage. ·

He remarks that it is a necessary consequence of the rights which a husband acquires by marriage with regard to his wife's person and property; and as the reason he assigns is a satisfactory one, I shall treat the rule as established, and overrule this objection.

The next objection goes to the jurisdiction of the court. It is insisted that Surrogates' Courts in this State are courts of special and limited jurisdiction, and if the parties in interest have been duly cited, and the surrogate has pronounced his sentence or decree, that he has no authority afterwards to revoke, alter, or amend it, except in certain specified cases, and that this is not one of them. On the part of the petitioners, on the other hand, it is claimed that the repeal of the provision in the Revised Statutes, by which the Surrogates' Courts were limited to the powers therein expressly enumerated, has restored these courts to every authority which they possessed prior to the revision of 1829. That they have now the same general powers which the ecclesiastical or spiritual courts of England exercised in testamentary matters, and in cases of intestacy, and can, after decree or sentence pronounced, give the same species of equitable relief, if mistakes or errors have been committed or injustice has been done, which may be had in a court of equity after a decree has been rendered.

In the Revised Statutes the powers conferred upon Surrogates' Courts were specifically defined, and it was declared that the powers therein enumerated should be exercised in the cases and in the manner prescribed by the statutes of the State, and in no other, and that no surrogate should, under pretext of incidental power or constructive authority, exercise any jurisdiction whatever not expressly given by some statute of the State. (2 *Rev. Stat.*, 220, § 1.)

In recommending this very stringent provision for adoption, the revisors in their notes said that the jurisdiction of surrogates was very undefined, and might give rise to most serious questions ; that the foundation of the authority exercised by the

colonial governors, and its extent, were questions which had already much agitated the courts; that the idea was entertained by some that these courts possessed all the powers and jurisdiction of the Ecclesiastical Courts of England, and that their own researches had satisfied them that a clear and distinct limitation of the powers of these tribunals was very necessary, and that they had accordingly attempted it by an enumeration of the powers conferred.

This restriction proved to be a very unwise one. The apprehensions which led to it were more imaginary than real. The effect of it was to create questions of doubt and difficulty, and to embarrass the surrogates in the exercise of their ordinary duties. It was consequently repealed in 1837. (*Laws of* 1837, 536, ch. 460, § 71.)*

The effect of this repeal came under consideration in the Court of Appeals, in the late case of Sipperly *a*. Baucos, December term, 1861; and it was there held by the judge who delivered the opinion of the court, Mr. Justice James, that the effect of it was to restore to these courts, except where they were particularly restricted by statutory enactments, the same powers substantially which they possessed before the Revised Statutes, together with those powers which were incidental and necessary to enable them to discharge the duties imposed upon them.

The question then arises, what were the powers vested in these courts before the Revised Statutes?

This is now a matter of great practical importance in this court, as questions analogous to the one now under consideration may constantly arise hereafter. Mr. Justice James, in Sipperly *a*. Baucos (*supra*), says that before the Revised Statutes the powers and jurisdiction of these courts were undefined, that the law respecting them and the subjects of their cognizance were defective, ambiguous, and irreconcilable, and the practice and decisions uncertain and contradictory. This is in consonance with the opinion expressed by the revisors; and that such an impression should prevail is very natural, as the whole subject has hitherto been involved in a great deal of obscurity.

---

* The amendment of 1837, substituted, for the clause above referred to, these words: "Which powers shall be exercised in the cases and in the manner prescribed by the statutes of this State."

This impression is, however, erroneous. The jurisdiction of these courts, before the Revised Statutes, was exactly defined, but, as the revisors found, exceedingly difficult to ascertain. Its history was very complicated, for it had undergone many mutations and changes, and as there were, especially during the colonial period, other tribunals exercising co-ordinate and additional powers, the whole subject became so intermingled that, without knowing exactly what was conferred upon these other tribunals, it was impossible to distinguish what the surrogates did, and what they did not, possess. The information necessary to explain it is now to be gathered from a long series of manuscript records, from contemporary colonial documents, some of which have been published and others not, and from early colonial statutes—with all of which I had occasion some years ago to become familiar, which will enable me to separate this hitherto entangled subject, and show exactly what powers were vested in the surrogates; but to do so it will be necessary to trace the course of this jurisdiction from the earliest period of our colonial history to the passage of the Revised Statutes.

When the colony of New York, or, as it was then called, New Amsterdam, was settled by the Dutch, all judicial power was vested in a council composed of the director-general, the vice-director, and the schout fiscal. (1 *Col. Doc. of N. Y.*, 160.) Afterwards a court was established of which the vice-director was the presiding judge, having associated with him members of the council, and in which the governor or director-general himself occasionally presided. Before this tribunal all matters pertaining to succession of estates, whether real or personal, were disposed of according to the Dutch Roman Law, the custom of Amsterdam, and the law of Aasdom. (*The Vertoogh, or Remonstrance of New Netherlands*, translated by Dr. O'Callaghan, 39, 59; 1 *Col. Doc.*, 160; 4 *Doc. History of N.Y.*, 69; *Daly's Historical Sketch of the Judicial Tribunals of New York from* 1623 *to* 1846,* 6, 8, 9; 2 *O'Callaghan's History of New Netherlands*, 24–31; *Albany Records*, 20–61.)

On the establishment of the Court of Burgomasters and Sche-

---

* This valuable monograph will be found prefixed to *E. D. Smith's Common Pleas Reports*, vol. i., p. xvii.

pens in 1653, jurisdiction of all such matters was transferred to it, with a right of appeal to the Governor and Council. Before this court, wills were admitted to probate, letters of administration granted, curators appointed to take charge of the estates of widows and orphans, executors and administrators were compelled to account, and distribution was decreed. As these duties, however, interfered very much with the ordinary business of the court, a Court of Orphan Masters was established in 1665, which had the power to grant letters of administration, to appoint guardians, and to regulate estates in all cases where it was not specifically excluded from so doing by the words of the testator's will. (*Records of the Court of Burgomasters and Schepens*, vols. I.–VI.; *Lachaire & Van Veen's Manuscript Notarial Registers or Protocols, in N. Y. Common Council Records; Daly's Judicial Tribunals*, 17, 18; *Street's Council of Revision of the State of N. Y.*, 20.)

After the conquest of the province by the English in 1664, the Court of Burgomasters and Schepens was changed into the Mayor's Court, a name by which it was known for one hundred and forty-six years afterwards, until the present name was given of the Court of Common Pleas. For some years, under the English rule, it continued to exercise the same functions as before, its proceedings being conducted in the Dutch language. The Court of Orphan Masters was discontinued, and the Mayor's Court, for a long period after its proceedings were conducted in English, exercised the same jurisdiction in respect to testamentary matters, and intestate estates of persons dying within the city, as it or the Court of Orphan Masters had exercised previously, with some modifications and restrictions. (*Records of Mayor's Court; Records of Wills in N. Y. Common Pleas Court*, vols. I. and II. ; *Daly's Jud. Tribunals*, 25, 26.)

When the government of the province was committed to Gov. Nicolls, by James II., then Duke of York, a body of laws was framed for its government, afterwards known as "The Duke's Laws," and this code, with such additions as were made to it by the Governor and Council, or at the annual sitting of the Court of Assize, the written instructions received by the governors from the home government, the principles of the common law, together with certain usages and customs derived

from the Dutch, constituted the law of the province, until the sitting of the first Legislative Assembly, in 1683.

By the Duke's Laws, a constable and two overseers were required to proceed to the house of a deceased person, forty-eight days after the death, and inquire respecting his estate, and whether he had left any will. They were required, further, to make an inventory of his effects, appraise the value, and make a return of their proceedings, under oath, to the next Court of Sessions.

The province was divided into three ridings, and in each of these ridings there was a Court of Sessions, composed of the justices of peace living within the riding, which was held twice a year. The probate of wills, the granting of administration in cases of intestacy, the final accounting of executors and administrators, together with such compulsory measures as were necessary to compel it, the removal of executors, the distribution of estates, and the appointment of guardians, took place in the first instance before the Court of Sessions, except in the city of New York, where the same jurisdiction was exercised by the Mayor's Court. If the estate, however, exceeded £100, all proceedings upon the probate of wills, and all records in cases of administration, had to be transmitted, duly certified, to the office of the secretary of the province in the city of New York, where they were required to be recorded, and where letters testamentary and of administration in such instances, and the final discharge of executors or administrators, which was called a quietus, were granted by the governor under the seal of the province. The proof and all proceedings took place in the first instance before the Court of Sessions or the Mayor's Court, and the court gave its judgment or opinion, which was transmitted to the governor under the certificate of one of the justices and the clerk, and the act of the governor was simply a formal ratification by the granting of letters or of discharges. In some instances the governor gave his judgment upon the construction of a will, and Governor Andre granted letters without any proceeding in court, but these were exceptional instances and of rare occurrence. In all proceedings before them, the Court of Sessions had the power of granting a rehearing, or, as it was called, a "review," and upon such review might in their discretion admit new evidence—a power, however, which was not

continued in the courts which succeeded, in 1691, to the civil jurisdiction of these tribunals. (*The Duke's Laws; Collection of the N. Y. Historical Society*, vol. I., 315, 404, 412, 415; *Records of Wills in N. Y. Surrogate's Office*, lib. I., 1, 3, 10, 19, 21, 28, 31, 38, 41, 67, 90, 91, 105, 190, 195, 270, 283, 355, 376, 377, 442; lib. II., 29; lib. III., 191; lib. IV., 129; *Book of Inventories*, vol. I., 1, 5; *Daly's Jud. Trib.*, 23–30; 2 *Rev. L. of* 1813, app. V.)

This state of things continued until 1686. In the letter of instructions transmitted in that year to Governor Dongan, he was, among other things, directed to see that the ecclesiastical jurisdiction of the Archbishop of Canterbury should take place in the province, "as farr as conveniently may bee," except the collating of benefices, the granting of marriage licenses, and the probate of wills, which were reserved to the governor; and in a similar letter of instructions to Sloughter, in 1689, the ecclesiastical jurisdiction of the Bishop of London was added. (3 *Col. Doc.*, 372, 688, 820.) The ecclesiastical jurisdiction of the Bishop of London, so far as it related to testamentary matters or the administration of the estates of intestates, was limited to cases where the effects of the deceased were exclusively within the bishop's diocese, and the jurisdiction was exercised by a court held in the diocese by the bishops, commissary, or surrogate; but if the deceased had left effects in more than one diocese, then the Archbishop of Canterbury had exclusive jurisdiction, and the matter was heard before his delegate in the Prerogative Courts, of which there were two, the prerogative offices at York and Canterbury. (*Ayliff's Parergon Juris Canonici Anglicana*, 192, 534, Lond., 1726; *Gibson's Codex*, 465, 471, 472, 478; *Godolphin's Orphans' Legacy*, 106; 4 *Inst.*, 335; *Williams on Ex.*, 248, 4 Lond. ed.)

After these instructions were received, a change took place in the course of procedure. The Courts of Sessions and the Mayor's Court continued to exercise the same functions as before, but the governor or the secretary of the province also took proof of the execution of wills and of the inventory and appraisement of estates; and in 1691, under the administration of Lieut.-governor Ingoldsby, a clause was inserted in all letters testamentary or of administration, that the granting of such letters, the hearing of accounts, the reckoning of administration,

and the granting of the final discharge, belonged to the governor, and not to any inferior judge. If a will was proved before the secretary, he annexed a certificate that "being thereunto delegated," the will had been duly proved before him; and an authentication, in the name of the governor, in the form that continued in use down to the Revised Statutes, that the will had been "proved, approved, and allowed," under the prerogative seal, was annexed, and the whole was recorded in the secretary's office—the validity of the record being attested by his signature. In this way a distinct department grew up in the secretary's office, which took the name of the Prerogative Office, and the records connected with it the name of the Registry of the Prerogative, and by 1691, the whole became distinguished by the judicial appellation of the Prerogative Court. (*Records of Wills in N. Y. Surrogate's Office from* 1683 *to* 1690 *and* 1691, 182, 229.)

The Legislative Assembly which was convened in 1683, having been established, was again reinstated in 1691, and at its second session, in 1692, an act was passed (*Laws of N. Y. from* 1691 *to* 1751, Smith & Livingston's ed., I., 15), by which it was declared that the probate of all wills and letters of administration should thenceforth be granted by the governor, or such person as he should delegate, under the seal of the Prerogative Office; that all wills in the counties of Orange, Richmond, Westchester, or Kings, should be proved in New York before the governor or his delegate, and in the remote counties in the Courts of Common Pleas—tribunals which had been created in each county by an act of the previous session; and where the proof was taken in the Courts of Common Pleas, it was required to be certified under the hand of the judge and clerk to the secretary's office in New York, where probate was granted. Where the estate was under £50, the Courts of Common Pleas were authorized to admit the will to probate, or to grant letters of administration, and from their decision an appeal was allowed to the governor, or to the person he might delegate to act for him. How this jurisdiction was then understood appears from a letter written the year following by Clarkson, the secretary of the province, to the Lords of Trade. (*Col. Doc.*, IV., 28.) "The governor," he says, "discharges the place of the ordinary (the bishop) in granting administration and in proving wills, and

the secretary of the province acts as registrar." The secretary of the province was an officer independent of the governor, holding his appointment from the Crown, the duties of which he discharged chiefly through a deputy. Governor Fletcher, immediately after the passage of this act, in 1692, appointed this deputy his delegate, and he took proof of wills, which were afterwards approved and allowed in the name of the governor. In 1702, Lord Cornbury appointed as his delegate a Dr. Budges, who was afterwards chief-justice of the province. The proof of wills was then taken before him, and upon his certificate letters were granted, by the deputy secretary, in the name of the governor. Before Dr. Budges also, executors and administrators were sworn faithfully to execute their trust; the renunciation of executors was formally made before him, and he took proof of inventories. This gentleman was a man of legal acquirements, and had received in England the degree of doctor of laws, and he was the first in the province to make use of the title of surrogate, adding it after his signature to all documents. (*Rec. of Wills*, VII., 3, 64, 87, 93, 129, 169, 212.) Dr. Budges having been appointed chief-justice, Cornbury appointed the deputy secretary his delegate, and this officer, with the exception of a few interruptions or changes, continued to act as the governor's delegate down to the time of the Revolution. The provision in the act of 1692, which required all wills in the counties named to be proved in New York before the governor or his delegate, was found to be exceedingly onerous. Travelling then was very different from what it is now, and to bring witnesses in all such cases to New York was attended with difficulty and expense. In view of this inconvenience, Cornbury, acting upon the previous precedent of Ingoldsby, and giving what was, perhaps, an allowable construction to the act of 1692, commissioned delegates to act for him in all of these counties; and at a later period under future governors, delegates were appointed for the more remote counties. (*Rec. of Wills*, VII., 212, 476, 489; VII., 18, 19; XII., 187, 199; XIII., 891; *Book of Commissions*, III., 473; V., 235, 412, 418, 420; VI., 4.) At the same time a local delegate was appointed for the city and county of New York, distinct and apart from the secretary of the province or deputy secretary, who were also commissioned to act as delegates. In fact an attempt was made to carry out, in con-

formity with the instructions that accompanied the governor's commission, the distinct jurisdictions in England by the commissary of the bishop diocesan, and the ordinary or delegate of the Archbishop of Canterbury; or what was then known as the Court held by the Commissary of the Bishop, and the Prerogative Court, held by the delegate of the archbishop or metropolitan. (*Gibson's Codex*, 465, 1035.) If the deceased had at the time of his death effects in more than one county, or as the official documents expressed it, "goods, chattels, and credits in divers places within the province," then the governor exercised exclusive jurisdiction. The will was proved before his delegate in the Prerogative Court. Letters were issued in the name of the governor under the Prerogative seal, attested by the signature of the secretary or the deputy secretary, and the whole was recorded in the registry of the Prerogative Court. If the deceased, however, had effects only in one county, then the will was proved before the local delegate of that county. He gave a certificate of the fact, and the will was then taken to the Registrar's Court, where it was approved and allowed, letters-testamentary were granted in the name of the governor, the seal of the Prerogative was affixed, and the whole was recorded in the registry of the court. Letters of administration could not be obtained only in the Prerogative Court. By the act of 22, 23 Car. II. (cap. 10), administrators were required to exhibit under oath an inventory of the personal estate of the deceased, in the registry of the court that granted letters; to make a true and just account, also under oath, to the court, of their administration, by the day fixed in their bond, which was not less than a year; their accounts were to be examined and allowed in that court, and they bound themselves to pay to such persons as the judge of that court should limit or appoint. This jurisdiction in the colony was vested in the Prerogative Court, executors and administrators accounted before it, and the decree upon final distributions was made there. It had the power to issue citations to compel the attendance of witnesses, and it heard appeals, where probate or administration was granted by the Court of Common Pleas; in addition to which it exercised a jurisdiction more especially ecclesiastical, such as the granting of marriage licenses, licenses to schoolmasters, and in taking proof of the due installation of clergymen. (*Rec. of Wills*

*in N. Y. Surr. Office*, II., 39, 104, 107; III., 149; IV., 129, 182, 213, 221, 230, 250, 328; V., 286, 333; VI., 1; VII., 474, 484, 491; VIII., 18, 19; XII., 197, 199; XIII., 891; XXVIII., 106; *Book of Inven.*, I., 5; *Rec. of Admin.*, I., 2; *N. Y. Col. Doc.*, VII., 830; VIII., 322, 413; *N. Y. Rec. of Marr.*, Albany, 1860; *Maunsell's Annals of Albany*, III., 327; IV., 16.)

The delegate who represented the governor in this court, or, as he might be called, the general delegate, was either the secretary of the province or the deputy secretary—generally the latter. He was empowered by his commission to admit wills to probate, to grant letters of administration, and for that purpose might " affix the prerogative seal of the province thereto, without any further fiat or allowance." (*Book of Coms.*, V., 62.)

No such general powers were conferred on the local delegates. They were authorized by their commissions to take proof of the execution of any will made by a person residing in their county, to swear executors or administrators that they would faithfully execute their trust, or that the inventories or accounts to be exhibited by them in the Prerogative Court were true, and to supervise the estates of intestates. This power of supervising the estates of intestates was in consequence of a clause in the act of 1692, which provided, that where any person died intestate, two freeholders of the town, to be annually elected, should inquire into the real and personal estate of the deceased, and make an inventory of it, and return it, under oath, to the person in the county delegated by the governor to supervise the estates of intestates; that the persons delegated should cause the goods and chattels to be sold, retaining the proceeds for those who should appear and have a right to claim them; and that if the deceased left orphans, and there was no widow or next of kin, that the person so delegated by the governor, should have the administration and care of the intestate's estate, and the guardianship of the persons and estates of the orphans, until they are married or reach the age of twenty-one ; a provision that was superseded and became inoperative by subsequent legislative enactments. (*Book of Commissioners*, III., 473.) With the exception of this provision, the powers of these legal delegates were not much greater in fact than that of commissioners of deeds in our day. They did little else except to administer formal oaths, for if any

contest arose upon the execution of a will, it was settled either in the Prerogative Court, from which alone letters could issue, or in the courts of record where it had to be proved in what was then called the solemn form *per testes*, to make it binding upon real estate. At first, these local delegates bore only the name of delegates, but about 1746 they began to assume the title of surrogates, and were so designated thereafter, in their commissions. There were thus, as in England, a local and a general tribunal, with this distinction, however, that the local tribunal here was much more limited in its powers; and further, by the fact, that its judicial acts, such as taking the proof of wills, had to be approved and ratified under the seal of the Prerogative Court.

In 1743 an act was passed for the more speedy recovery of legacies. By this act any person entitled to a legacy or a residuary estate under a will, or to any share in the estate of an intestate, might bring an action against the executors or administrator, after it became due, or, if no time was fixed by the will, after a year had expired, to compel its payment, in the Supreme Court or any court of record, if it amounted to more than £20, or if under that sum in a Court of Common Pleas; and if a plea of want of assets was put in, the court was empowered to appoint auditors to examine the accounts of the executor or administrator, who were to report how the account stood, and what sum would remain after the payment of debts, and what proportion the plaintiff was entitled to. The court was empowered to correct any mistakes or errors in the accounts reported, and for the amount found to be due the plaintiff had execution, which act continued in force down to the Revised Statutes. (*Laws of N. Y.*, Smith & Livingston's ed., I., 316; *Street's N. Y. Council of Revision*, 281.) This act and the general jurisdiction exercised by the Court of Chancery in such cases, furnished a much more effectual remedy than the Prerogative Court could afford, and the practice of accounting in that court, therefore, fell into disuse, except when an executor or administrator filed his account with the view of obtaining his discharge, and in time the common-law courts were but rarely resorted to, as the remedy in equity was more efficient and better adapted for adjusting the rights of all parties.

I have thus given, as far as it is now possible to ascertain it, the exact jurisdiction exercised by the Prerogative Court. No

minutes of the sittings of this court, if any were ever kept, or if it ever had any regular sittings, which I very much doubt, are to be found.\* In fact, its whole business was managed for seventy years before the Revolution by the secretary of the province and his deputy, with little interference on the part of the governor, and with but little knowledge on their part respecting it. In connection with the registry, which the secretary claimed as a part of his office, every thing was done to keep the court exclusively under the control of this officer. It was entirely managed by his deputy, who fulfilled many functions, which were so mixed up as the acts of one and the same person that it was difficult even then to distinguish the varied capacities in which he acted. The precise character of his powers or those of the secretary, together with the extent or nature of the authority which in virtue of the governor's prerogative was vested in the Prerogative Court, were matters of great perplexity then, and a constant subject of complaint and remonstrance. (See *Gov. Moore's Letter to the Lords of Trade*, and *Gov. Tryon's* upon the same subject; *Col. Doc.*, VII., 130, 187, 283, 323.) One of the last of the secretaries, Clark, held no less than twelve distinct offices, nearly all of them connected with the administration of justice, and his deputy, Goldsbrow Banyan, who held that office with but few interruptions from 1746 to the Revolution, in addition to acting as the general assistant of his principal, was examiner of the Prerogative Court, and the local delegate for the city and county of New York, while at the same time he fulfilled the function of general delegate, or, as Gov. Tryon describes the office, acting as principal surrogate. A course of management which was designed to

---

\* The records belonging to it, and every thing appertaining to wills and the administration of estates, were carried to Albany during the Revolution, before the evacuation of the city by the American troops. An act was passed in 1799 (2 *Greenleaf's Law of N. Y.*, 420), directing the judge of the Court of Probate to deliver to the surrogate of the city and county of New York all books, records, minutes, documents, and papers, belonging to the Court of Probate before the 1st of May, 1807, in pursuance of which the late Sylvanus Miller, who was then surrogate, went to Albany in 1800, and brought away every thing that could then be found. I presume that if any minutes had ever been kept of the court, they would have existed then, and would have been discovered by Judge Miller, as the chain of records now here, and which he arranged and classified, are, for the whole colonial period, very complete and perfect.—DALY, J.

baffle all inquiry then, and which succeeded in doing so (see *Report of the Lords of Trade, N. Y. Col. Doc.*, VIII., 413), was not very easy to unravel afterwards, and, therefore, when the Revolution broke out, very confused ideas prevailed as to the nature of jurisdiction of this court, and even as to its name —being sometimes called the Prerogative Court and sometimes the Court of Probate; a confusion of names which led to the impression that these were two tribunals before the Revolution,— an impression which I formerly entertained (*Daly's Judicial Tribunals of N. Y.*, 53 ; *Rec. of Com.*, V., 70, 412, 418 ; VI., 201),—whereas there was in reality but one. The Legislature, in 1778, meant to sweep away every authority vested in this court in virtue of the prerogative of the colonial governors, sup- posing it to be greater than it actually was, and to constitute a court thereafter to be held by a single judge, having the same jurisdiction in testamentary matters and in cases of intestacy, to be known as the Court of Probates ; and accordingly in an act passed in that year it was declared that the judge of the Court of Probate should be vested with the powers and author- ity, and have the like jurisdiction in testamentary matters, which the governor of the colony of New York, while it was subject to the crown of Great Britain, had and exercised as judge of the Prerogative Court, or the Court of Probates of the colony, except the power of appointing surrogates. (1 *Laws of N. Y.*, Jones & Varick's ed., 23.)

From this period to 1789, this new tribunal, the Court of Probates, continued to exercise the same jurisdiction in such. matters as the Prerogative Court had done. The proof of wills, where the deceased had effects in more than one county, was taken before the judge of that court, and before the surrogate where the effects were exclusively in one county ; and in both cases, the proof of the will was " approved and allowed" in the name of the People, before the Court of Probates, where it was recorded, and from which letters issued under the seal of the court, attested by the signature of its clerk. Letters of admin- istration were also granted there, and all inventories were filed there. This court held stated sittings, at regular periods, in different parts of the State, until 1783, when it was fixed in the city of New York until 1787, after which it was permanently removed to Albany, and up to 1797 the surrogates of the dif-

ferent counties continued to exercise exactly the same powers
which they did before the Revolution. (*Rec. of Wills in N. Y.
Surrogate's Office*, XXXII., 50, 360; XXXIII., 2, 19, 59, 316,
421, 438; XXXIV., 436; XXXV., 290; XXXVI., 2;
XXXVII., 316, 427; XXXIX., 286, 436; 1 *Rec. of Inventories*, 1; *Rec. of Adms.*, IV., V., VI., VII.)

In that year, 1787, an important change was made; an act
was passed (2 *Laws of N. Y.*, Jones & Varick's ed., 71), by
which the granting of probate and of letters of administration
was taken away altogether from the Court of Probates, except in
certain specified cases, and conferred upon the surrogates of the
different counties, from whose decision in contested cases an appeal was allowed to the Court of Probates. This act provided
that the governor, with the consent of the council of appointment, should commission a surrogate for every county in the
State, and empowered each surrogate to take proof of the last
wills and testaments of persons dying in his county, or who was
an inhabitant of it if he died from home, to issue probate and
grant letters-testamentary thereon, or letters of administration
with the will annexed; or where such person died intestate to
grant letters of administration, such letters to issue in the name
of the People, and to be tested in the name of the surrogate, and
sealed with the seal of his office. This act further provided that
each surrogate should record all wills proved before him, with
the proof thereof, and all letters-testamentary or of administration issued by him, with all things concerning the same, and
directed that when administration was granted by him, that the
inventory should be " exhibited" in his office.

Where persons died out of the State, or within it who were
not inhabitants, the act directed that their will should be proved
before, or administration of their personal estates should be
granted by, the judge of the Court of Probate, and in such cases
the inventory was " exhibited " in the registry of that court.
This act also gave the Court of Probates authority to compel
administrators to account in cases of intestacy, to decree and
settle the order of distributions after the payment of debts and
expenses, and to compel the payment of the amounts so decreed.
It was empowered, also, to hear and determine all causes touching any legacy or bequest in any last will and testament, payable out of the personal estate of the testator, and to compel

Brick's Estate.

payment of it. This was a provision virtually empowering the court to call executors to account, which was an important change, as before that time probate or ecclesiastical courts had no power either by the canon law, or by statute, to compel executors to account. (Sparrow *a.* Norfolk, *Noy's R.*, 28; *Gibson's Codex*, 466, 478.) Authority was also given to the court to enforce its decree for the payment of distributive shares or bequests or legacies, by execution against the person, and by the twentieth section of the act it was declared that " the courts of the said surrogate and the said Court of Probates, in the matters submitted to their cognizance, respectively, by this act, shall proceed according to the course of the courts having, by the common law, jurisdiction of like matters."

In 1786, the Court of Probates, where the personal estate was insufficient to pay debts, was empowered to order the sale of the real estate, and make distribution of the proceeds among the creditors (1 *Greenleaf's Laws*, 238), but when the court was removed permanently to Albany in 1797 (3 *Ib.*, 391), it was found very inconvenient to resort thither in all cases for that purpose, and accordingly in 1799 (*Laws of N. Y.*, 1799, Andrew's ed., 724), an act was passed conferring this power upon the surrogates when the lands of the deceased were exclusively in one county, and by the same act they were authorized to admit wills to probate or to grant letters of administration where persons died out of the State, or within it who were not inhabitants.

In 1801 the surrogates were clothed with the same power as the judge of probate, to cite the administrators to account, to decree distribution or the payment of bequests and legacies, and compel it by execution. (1 *Webster's Laws*, 317, 325; Seymour *a.* Seymour, 4 *Johns. Ch.*, 409; Foster *a.* Wilber, 1 *Paige*, 537; Dakin *a.* Hudson, 6 *Cow.*, 221.) In 1802 they were authorized to appoint guardians for infants as fully as the chancellor might do (3 *Webst.*, 158); in 1806, to order the admeasurement of dower of lands within their county upon the application of the widow, the heirs, or the guardians of minors (*Ib.*, 316); in 1807, to exercise powers as extensive as the Court of Probates in ordering sale of lands for the payment of debts (5 *Ib.*, 138); in 1810, to order the mortgaging or leasing of the land of testators or intestates for the payment of debts, where any infants were interest-

ed; and all these laws, whether relating to the surrogates or to the Court of Probates, were incorporated in one general act in the revision of 1813, in which act are also embraced some other general powers, such as compelling the production of wills, documents, or writings, the attendance of witnesses, and the power of punishing for contempts; and, by an act passed in the same year, they were authorized to complete the unfinished business that might be left by their predecessor. (*Laws of* 1813, 139.)

In 1819 they were empowered to confirm sales of real estate ordered by them for the payment of debts, and to direct conveyances to be made by executors or administrators. (*Laws of* 1819, 214.) In 1821, to institute an inquiry respecting the personal estate of intestates not delivered to the public administrator nor accounted for in a lawful and satisfactory manner, by the person into whose hands it was supposed to have fallen.

By the act passed in 1823, the Court of Probates was abolished. Its appellative jurisdiction on appeal from surrogates. was transferred to the Court of Chancery, and whatever other jurisdiction it possessed was by this act vested in that court. (*Laws of* 1823.)

From 1823 to the passage of the Revised Statutes, the only acts of a general character relating to surrogates were acts directing them to record all letters testamentary and of administration, all appointments of guardians, and all orders and decrees upon the sales of real estate made by themselves or their predecessors. (*Laws of* 1828, 136.)

It will be seen as the result of this lengthened examination, that the powers conferred upon surrogates were from the beginning carefully enumerated in the commission under which they were first appointed, and by subsequent legislative acts; that what was not granted to them was vested before the Revolution either in the Prerogative Court, the Supreme Court, the Court of Common Pleas, and the Court of Chancery, and afterwards in the Court of Probates. That when the Prerogative Court was abolished in 1778, its jurisdiction in testamentary matters and in cases of intestacy was transferred to the Court of Probates; and that when that court was abolished in 1823, that its jurisdiction was vested in the Court of Chancery. The Supreme Court and the Courts of Common Pleas had, as has been shown

under the provision in the act of 1743, the power of compelling executors or administrators to account in actions brought to recover legacies or distributive shares, and wills of real estate were proved in the Supreme Court or the Court of Common Pleas until the passage of the Revised Statutes.

In tracing the history of these separate jurisdictions, I regret to have had occasion to go into such minuteness of detail, but it was essential that the exact authority vested in each tribunal should be distinctly shown, to take away any foundation for those "serious questions" of which the revisors were so needlessly apprehensive.

I have pointed out all the powers granted to surrogates throughout the whole course of our colonial and State history down to the passage of the Revised Statutes, and that they may be taken collectively, I will recapitulate them:

I. To take proof of the execution of last wills and testaments, and to admit them to probate.

II. To grant letters testamentary and of administration.

III. To swear executors or administrators to the truth of the inventories and accounts exhibited by them.

IV. To call administrators to account; to decree the just and equal order of distribution after the payment of debts and expenses; to compel administrators to observe and pay the same; and to enforce it by execution against the person.

V. To hear and determine any cause touching a legacy or bequest in any last will and testament; to decree the payment of it, and to enforce it by execution against the person.

VI. To order the admeasurement of dower upon the application of the widow, of any heir, or of the guardian of a minor.

VII. To order the sale of real estate for the payment of debts when the personal estate was insufficient, and when the real estate proved insufficient to divide the proceeds after the payment of expenses proportionally among the creditors; to confirm all such sales and direct conveyances to be made by executors or administrators, and to order the mortgaging or leasing of the real estate of any testator or intestate for the same purpose when infants are interested.

VIII. To appoint guardians for infants as fully as the chancellor might do.

IX. To record all wills proved before them, with the proof

thereof, letters testamentary and of administration granted by them, with all things concerning the same, all orders or decrees made by them for the sale of real estate, and all instruments, writings, or documents of a like nature left unrecorded by their predecessors, and to complete the unfinished business of their predecessors.

X. To institute inquiry respecting the personal estate of intestates not delivered to the public administrator nor accounted for lawfully by persons into whose hands it was supposed to have fallen.

XI. They had authority to compel the attendance of witnesses, the production of wills, documents, or writings, and for disobedience in such cases to commit the party offending for contempt; and lastly, in all matters submitted to their cognizance, they were authorized to proceed according to the course of the court having by the common law jurisdiction of such matters, except so far as they were restricted by statute; and they had such incidental powers as were necessary to carry those which were granted into effect. (See *Clows' Commission, Rec. of Coms.*, III., 473.)

This enumeration embraces all that ever was granted to them down to the passage of the Revised Statutes. In that revision the jurisdiction of the Surrogates' Courts was considerably enlarged, but nothing was taken away. By the 6th subdivision of § 1, title 1, chap. 2, Part III., of the Revised Statutes (2 *Rev. Stat.*, 220), they were "authorized to administer justice in all matters relating to the affairs of deceased persons according to the provisions of the statutes of the State." Now, all the powers which had ever been conferred upon the surrogates or Surrogates' Courts, from the earliest colonial period down to this revision, either in the commission originally granted by the governors or in the colonial statutes, were all enumerated in statutes of the State, passed under the State government, from the act of the 20th of February, 1787, to the act of the 31st of March, 1828. There was but one not expressly named, that of swearing executors and administrators to the truth of their inventories or accounts, but this was embraced by the general provision in the act of 1787, authorizing the Surrogate's Court to proceed in the matters submitted to their cognizance, according to the course of the courts having by the common law juris-

diction in like matters, which courts always had the power of
swearing executors or administrators to the correctness of their
inventories and accounts. (*Conset's Practice of Spiritual Courts*,
ed. of 1708, 11, 112.) The difficulty, however, caused by the
Revised Statutes, was the incorporation of the clause previous-
ly referred to, declaring that no surrogate should, under pretext
of incidental power or constructive authority, exercise any
jurisdiction not expressly given by some statute of the State,
and the doubt which this produced was whether these courts
could exercise even those incidental powers, such as adjourning
from day to day, swearing witnesses, &c., which were necessary
to carry those which were granted into effect. In the early
commissions to the surrogate, there was a clause expressly re-
serving to them all such incidental powers. (See *Clows' Com-
mission, Rec. of Coms.*, III., 473.) But no clause of a like
nature was contained in any statute passed under the State
government, or during the colonial period, and the question
that was raised under this very stringent provision was, whether
such incidental powers could be exercised, as they were not
" expressly given by some statute of the State." There was, in
reality, no solid ground for this doubt, as they had never been
taken away. They were, in my judgment, sufficiently embraced
in the general provision which I have referred to in the act of
1787, or, if they were not, they followed as incidental to the
powers granted. If, however, there was any ground for the
belief that they had been taken away, the repeal, in 1837, of
this most unnecessary provision, restored them; but it restored
nothing else, as these courts had, by the clause of the Revised
Statutes which I have quoted, every other power which they
had previously possessed.

Having now arrived at a clear understanding of the exact
extent of the authority now vested by law in the Surrogates'
Courts, it remains to inquire how far the authority which has
been conferred upon them entitles them to revoke, alter, or
change their final acts or decrees. The only direct statutory
provisions of the kind are the clauses of the Revised Statutes,
empowering them to revoke letters of administration or of
guardianship in the cases specified, or to revoke the probate of
a will upon a rehearing, where application is made by next of
kin, within a year after the probate was granted. (2 *Rev. Stat.*,

62, 78; *Laws of* 1837, ch. 460, § 28; 1846, ch. 288; same stat., 3 *Rev. Stat.*, 5 ed., 142, 162, 163, 164.) Whatever other power they possess in this respect, is derived from the general clause in the act of 1787, directing the Court of Probates and the Surrogates' Courts to proceed in the matters submitted to their cognizance, according to the course of the courts having by the common law jurisdiction of like matters. It has already been seen, that the Surrogates' Courts were subordinate to the Court of Probates, and that the jurisdiction of that tribunal was transferred to the Court of Chancery, the jurisdiction of which was afterwards transferred to and is now vested in the Supreme Court. When the act of 1787 was passed, the courts which had then, by the common law, jurisdiction analogous to that of the Surrogate's Court and the Court of Probate, were tribunals in England known by the general appellation of the Ecclesiastical or Spiritual Courts, a jurisdiction that was entirely swept away in 1857, upon the creation of a General Court of Probate for the whole kingdom. (20 & 21 *Victoria*, cap. 77.)

They were all of them inferior courts of special and limited jurisdiction. (3 *Blackst. Com.*, 67; *Tomlin's Law Dictionary*, *Courts;* Paff *a.* Kinney, 1 *Bradf.*, 4), and composed a very numerous family, as there were, at one period, in England, no less than three hundred and eighty various probate jurisdictions. (1 *Bradf.*, introduction.) They were, nearly all of them, local courts, known by various names: Diocesan Peculiars, Royal Peculiars, Manorial, Court of Hustings, Orphans' Court, &c., &c., many of them having different usages or modes of procedure, while some, like the Prerogative Courts of York and Canterbury, exercised in certain cases, throughout the kingdom, powers analogous to those of our surrogates. (*Gibson's Codex*, 978, and title XXIV.; *Ayliffe's Pareregon*, 94, 417, 418, 534; *Bohun's Customs of London*, 228.)

The tribunals, however, whose powers and modes of procedure approached most nearly to the courts held by our surrogates when this act was passed in 1787, and to which it is manifest the framers of this statute meant to refer, were the courts held in each diocese by the commissary or surrogate of the bishop, and the more general tribunal held by the ordinary of the Archbishop of Canterbury, known as the Prerogative Court.

These courts were recognized by the common law as having

jurisdiction in the matter of which they took cognizance, and in which they proceeded according to the course of the civil and canon law.

They were not courts of record, and never had the broad general powers to review and correct their proceedings possessed by courts of that high character. (4 *Inst.*, 321; 3 *Blackst. Com.*, 67; Doran *a.* Dempsey, 1 *Bradf.*, 490; Corwin *a.* Merritt, 3 *Barb.*, 341; People *a.* Corlies, 1 *Sandf.*, 228, 247; Dakin *a.* Hudson, 6 *Cow.*, 221.) Still, as indispensable to the administration of justice, they had and exercised, as have the Surrogates' Courts in this State to a certain limited extent, the right of revoking acts done by them, as where a decree is obtained by collusion or fraud (Wilkins *a.* Brunt, 1 *Curties Ecc. R.*, 264; *Toller on Exec.*, 2 Am. ed., 73), or where a later will is produced (Laton *a.* Laton, 1 *Hagg. Ecc. R.*, 683; *Wentworth's Office of Exec.*, 14 ed., 111, 112; *Williams on Exec.*, 478), or where after a will is admitted to probate the party supposed to be dead appears. (*In re* Napier, 1 *Phillm. Ecc. R.*, 83.) They could revoke letters of administration for any just cause (Granson *a.* Doun, *Skinner*, 155; Taylor *a.* Shaw, 3 *Jones*, 161; *Wms. on Exec.*, 478, note 1, 479), or correct mistakes which were the result of oversight or accident (Sipperly *a.* Baucas, 1861, *Ct. of Appeals, Dec. Term;* Shannessy *a.* Allen, 1 *Lee Ecc. R.*, 9; Cargill *a.* Spencer, 3 *Hagg. Ecc. R.*, 146); or where through an accident or mistake a decree was taken by default they might open it and allow the parties in default to be heard (Pew *a.* Hastings, 1 *Barb. Ch.*, 452); or where after a decree for distribution had been made, but before the fund was actually distributed, a legatee not known to be in existence appeared, the decree might be opened so as to allow him to receive his distributive share (Farrell *a.* Smith, 2 *Ball & B.*, 337; 2 *Rev. Stat.*, 220, subd. 3, § 1, tit. 1, ch. 2, part 3); or where they had acted without acquiring jurisdiction of the person, or where a party in interest had not been cited, or where no guardian had been appointed to look after the rights of an infant, they might open their decree and allow the party affected by it to be heard; or where an order is actually made, but not entered through mistake or accident, they might order it to be entered *nunc pro tunc* (Butler *a.* Emmett, 8 *Paige*, 12); and generally might vacate any act or proceeding done by them which was irregu-

lar and void. (Trimbleton *a.* Trimbleton, 3 *Hagg. Ecc. R.*, 243; Skidmore *a.* Davies, 10 *Paige*, 316; Vreedenburgh *a.* Calf, 9 *Ib.*, 128; Corwin *a.* Merritt, 3 *Barb.*, 341; Procter *a.* Wanmaker, 1 *Barb. Ch.*, 302; Bloom *a.* Burdick, 1 *Hill*, 130.)

I have pointed out, so far as it is shown by the authority of adjudged cases, the extent to which these courts have exercised this limited power, and the whole may be summed up briefly in the statement that they may undo what has been done through fraud, or upon the supposition that they had jurisdiction, or on the assumption that a party was dead who is living, or that there was no will; or they may open decrees taken by default, or correct mistakes, the result of oversight or accident, and in this State revoke the probate of wills or letters of administration, or of guardianship in the cases provided for by statute. These are all powers existing of necessity, and indispensable to the administration of justice, under which may be embraced any other exercise of jurisdiction of a like nature or character. But when, as in this case, all the parties in interest have been represented at the hearing, and the court has given its final sentence or decree, I know of no authority showing that these courts have ever exercised the general power of opening and reversing it again, upon the ground that they had erred as to the law, or had decided erroneously upon the facts.

No authority has been cited by the learned and experienced counsel, who has argued so strenuously for the existence of the right, and if any could be found I am sure it would not have escaped his vigilance. I have myself examined all the works relating to the practice of ecclesiastical courts to which I have had access, and which embraces *Conset's*, *Bayo's*, *Coote's*, *Gibson's Codex*, *Ayliffe's Pareregon*, *Godolphin's Orphans' Legacy*, *Cockburn's Assistant*, *The Clerk's Instructor*, *Swinburne on Wills*, *Practice of Ecclesiastical Courts* in 1 *Brown's Civil and Admiralty Law*, and *Burns' Ecclesiastical Law*, and I find nothing to countenance it, but the contrary. (Watkins *a.* Bligh, 1 *Curties Ecc. R.*, 264.)

There is in ecclesiastical courts what is known as "rescinding a conclusion." After the cause is ended upon both sides, and the court has given its conclusion upon the facts, a motion may be made to it to rescind the conclusion and allow the party applying to submit additional evidence. (Hammerton *a.*

Hammerton, 2 *Hagg. Ecc. R.*, 1; on appeal, *Ib.*, 623; Ingram *a.* Wyath, 1 *Hagg.*, 101; Scale *a.* Price, 2 *Consistory R.*, 191; Middleton *a.* Middleton, 2 *Hagg.*, 134; Donnellan *a.* Donnellan, *Ib.*, supp., 144; Cargil *a.* Spence, *Ib.*, supp., 146; Henley *a.* Doddridge, *Ib.*, 146; Shannessy *a.* Allen, 1 *Lee Ecc. R.*, 9.)

It is allowing the party against whom the conclusion operates to supply evidence, the want of which or the insufficiency of which is indicated in the opinion or conclusion of the judge, such as when the proof of the identity of a particular party is not sufficient, or there is any other defect in the proof, the want of which is pointed out by the judge, which application is granted or not, in the sound discretion of the court. It may be made before publication (when the depositions are completed, and a day fixed for the hearing); but if made after, the party must show that the facts came to his knowledge afterwards. (Webb *a.* Webb, 1 *Hagg. Ecc. R.*, 349.) It is, in fact, analogous to the practice in common-law courts of receiving additional evidence after the court has indicated its intention to nonsuit, or of granting a new trial after verdict, upon the ground of newly discovered evidence.

The course of procedure was this : When the depositions were completed, a day was assigned for the hearing. On that day the parties were heard, after which the court pronounced its sentence ; and the clerk, or one of the writers of the court, was instructed to draw it up formally in writing, and a day was assigned for the party against whom it operated to show cause why it should not be made definite. Before it was made definite the party might move the court to rescind its conclusion, and receive additional evidence, but if no such motion was made, and on the day assigned no cause was shown, or if the party failed to appear, after being called three times, the sentence became definite, and the party had no further remedy except by appeal to a higher tribunal—the time for which was limited. A decree, in the language of Conset, whether interlocutory or definite, was final, and there was "no hope of another sentence, or other decree. It put an end to the thing." (*Conset's Practice of Spiritual or Ecclesiastical Courts*, ch. 5, 6, part 3, ed. of 1708; *Oughton's Ordo Judiciorum*, tit. 124 to 131.)

This was the course of procedure in these courts when the act of 1787 was adopted, and though it was afterwards modi-

fied in some particulars, it underwent no change as respects the
conclusive and final character of the decree or sentence. (3
*Burns' Eccles. Law,* Phillimore's ed., 207, 211, 217, 218; 1
*Brown's Civil & Admiralty Law,* Am. ed., 451.)

The practice which prevailed in the Court of Chancery, of
giving relief after the decree was enrolled, by a bill of review
(O'Brien *a.* O'Connor, 2 *Ball & B.,* 154; Young *a.* Kelly, 16
*Ves.,* 343), or of entering a caveat after the decree was render-
ed, but before it was enrolled, which entitled the party dissat-
isfied with the decision to petition for a rehearing upon the
certificate of counsel, was never adopted in the ecclesiastical
courts.   There was, by the canon law, the practice of entering
a. caveat to stop proceedings where a question was raised as to
admitting a will to probate, or as to the right of administra-
tion, which it was said stood in force for three months, but this
was a mere precautionary measure to prevent the ordinary
from doing what was wrong, and was not the foundation of any
proceeding to obtain a rehearing or the reversal of a decree or
sentence. (*Gibson's Codex,* 778; *Godolphin's Orphans' Lega-
cy, Ph.,* 2, c. 33, § 5; 3 *Burns' Eccles. Law,* Phillimore's ed.,
224; Trimbleton *a.* Trimbleton, 3 *Hagg. Ecc. R.,* 243.)

There was, in fact, no occasion for adopting in these courts
the practice which prevailed in chancery, of a bill of review,
or allowing a rehearing, or in the common-law courts of direct-
ing a new trial, as all that could be procured in these courts by
a bill of review, a rehearing, or a new trial, was obtained in the
ecclesiastical courts by an appeal.   The case came up on ap-
peal exactly as it was presented to the court below.   The ap-
pellate court could review the facts as well as the law.   They
might come to a different conclusion upon a contested question
of fact from that which was arrived at in the tribunal below,
and might, in their discretion, allow additional evidence to be
given.   If the probate of a will, for instance, was reversed upon
appeal, and the parties could supply the evidence essential to
prove its due execution, the evidence was given, not in the court
below, but in the appellate court, and the will was admitted to
probate there. (*Cockburn's Clerk's Assistant,* Dublin ed. of
1703, 282; 1 *Brown's Civil & Admiralty Law,* Am. ed., 500;
Hammerton *a.* Hammerton, 2 *Hagg. Ecc. R.,* 623; Burgoyne
*a.* Free, 2 *Adams Ecc. R.,* 405; Eagleton *a.* Kingston, 8 *Ves.,*

466; Williams *a.* George, 3 *Curties Ecc. R.*, 343; Rochefort *a.* Nugent, 1 *Brown P. C.*, 590; *Toller's Law of Exec.*, 2 Am. ed., 75; Jephson *a.* Riers, 3 *Knapp*, 136.) In the common-law courts it is very different. There the verdict of the jury upon a contested question of fact is conclusive, and if the judge before whom the case was tried has committed any error of law which might possibly have influenced the verdict, there is no remedy but to order the cause to be tried over again. Whatever, therefore, could be obtained in the Court of Chancery by a rehearing, or in the common-law courts, by a new trial, was obtainable in the ecclesiastical courts by an appeal; and that being the remedy, the inferior courts never exercised the general power of reviewing their decrees for errors of law or fact. The Surrogate's Court here holds exactly the same position. The Supreme Court, to which the appeal lies, may; if it think proper, receive additional evidence, which it did in the appeal from this court, in the case of Ferrie *a.* Public Administrator (4 *Bradf.*, 28; 23 *N. Y.*, 90); and I am very clear, therefore, upon the point, that it cannot exercise a power not incident to the powers enumerated in the Revised Statutes, and which never belonged to the ecclesiastical courts exercising a like jurisdiction.

It is next claimed that the surrogate never acquired jurisdiction of the person of the petitioner, upon the ground that she was not cited in the mode required by law. On recurring to the affidavit, it appears that the citation was served upon her in the presence of her mother, her testamentary guardian; that she was informed, and had full knowledge of its meaning and effect, she being then in her sixteenth year,—which she, however, denies; that she attended upon the accounting, and that she knew of the matters which took place there, which she also denies; and that Gabriel Van Cott, Esq., an experienced person in matters of account, the chief clerk in the surrogate's office, was appointed by the court her special guardian upon such accounting; that he acted upon the appointment, and made an examination of the books, documents, and papers belonging to the estate; that Alexander W. Bradford, Esq., the former surrogate, acted on behalf of a sister who was a minor, and for a brother of the petitioner; and that the executor's account was made under the directions of Mr. Van Cott, and was examined

and approved by Judge Bradford. The service of the citation was in the mode pointed out by the chancellor in Kellett *a.* Rathbun (4 *Paige,* 102), that is, upon the petitioner, in the presence of her legal guardian. It was sufficient, therefore, to give the surrogate jurisdiction, and her general guardian having an interest adverse to her, a special guardian was appointed by the court, which was the proper course. (Turner *a.* Felton, 2 *Philm. Ecc. R.,* 93 ; Kellett *a.* Rathbun, *supra.*) And even if there had been any defect in the citation, or in the service of it, the petitioner actually appeared before the surrogate, which was sufficient to give him jurisdiction to appoint a special guardian to act for her.. (*Conset's Practice of Spiritual Courts,* 51, 52 ; *Exp.* Dawson, 3 *Bradf.,* 130.)

It is alleged that, by the 4th section of title 3, ch. 8, part 2, of the Revised Statutes (2 *Rev. Stat.,* 150), a guardian could not be appointed to act for the petitioner in this proceeding, unless upon her own application, by petition to the surrogate, as she was over fourteen years of age. The section to which the counsel refers, in support of the objection, relates to the appointment of general guardians of the persons and estates of infants, and not to the appointment of special guardians, to act for them in a suit or proceeding, or, as they are commonly called, guardians *ad litem.* (Kellinger *a.* Roe, 7 *Paige,* 362.) The authority to appoint guardians *ad litem,* is not only found in the general powers given to surrogates in the 7th subd. of section 1, title 1, ch. 2, to appoint guardians for minors (2 *Rev. Stat.,* 220), which is to be interpreted in connection with the 20th section of the act of 1787, before referred to ; but this is an authority which is incident to every court of justice, whether it be of inferior or of general jurisdiction, and may be exercised by a justice of the peace. (*Co. Lit.,* 89, *a. n.,* 3 ; *Blk. Com.,* 427 ; 2 *Kent. Com.,* 229 ; Mockey *a.* Grey, 2 *Johns.,* 192 ; Clark *a.* Gilmartin, 12 *N. H.,* 515.) In the appointment of guardians *ad litem,* the consent of the infant is not necessary, for if he refuse to name one, the court will appoint one. (Stone *a.* Attwell, *Strange,* 1076 ; Knickerbacker *a.* De Freest, 2 *Paige,* 304.) And this is the practice in ecclesiastical courts. (4 *Burn's Ecc. Law,* by Phillimore, 9 Lon. ed., 151.) Nor is it necessary that the infant should actually appear in court. (2 *Paige,* 304 ; Mason *a.* Denison, 15 *Wend.,* 64 ; Peck *a.* Holstead, 21 *Ill.,* 219 ; Jack *a.* Da-

vis, 29 *Geo.*, 219.) Formerly the practice was, where the infant lived at a distance, to appoint a commissioner dwelling in the vicinity of his residence, to select a fit and proper person to act for him. (*Conset's Practice of Spiritual Courts*, 51–53.) But even this can now be dispensed with, for, if a person offers to appear for the infant, who is known to the court to be respectable and capable, he will be appointed at once. (Smith *a.* Palmer, 3 *Beav.*, 10; Jongsina *a.* Pfiel, 9 *Ves.*, 387; Banta *a.* Calhoun, 2 *A. K. Marsh*, 167; Knickerbacker *a.* De Freest, 2 *Paige*, 304, and notes of the reporter; Concklin *a.* Hall, 2 *Barb. Ch.*, 136.) Nothing to the contrary appearing in the evidence before me, I must presume that the surrogate appointed the guardian *ad litem*, on the return of the citation, according to the established practice of the court. (Downing *a.* Rugar, 21 *Wend.*, 184; Rex *a.* Hawkins, 10 *East*, 211; Monk *a.* Butler, 1 *Rol.*, 83; Powell *a.* Millbank, 3 *Wils.*, 355; Foot *a.* Stevens, 17 *Wend.*, 483; *Willard on Executors*, 32.)

The petitioner, therefore, being properly before the court, the surrogate acquired jurisdiction to make any order of decree in the matter affecting her interests. The statute declares that the final settlement of the account, and the allowance thereof by the surrogate, shall be, against all persons interested in the estate upon whom the citation was served, conclusive evidence of the following facts and of no other: 1. That the charges in the account for money paid to creditors, legatees, next of kin, and for necessary expenses, are correct. 2. That the executor or administrator has been charged all the interest for money received by him, and embraced in his account, for which he was legally accountable. 3. That the moneys stated in such account, as collected, were all that were collected on the debts stated in such account, at the time of the settlement thereof. 4. That the allowance of the accounts for any decrease in the value of any assets, and the charges therein, for the increase in such value, was correctly made. (2 *Rev. Stat.*, 94, § 65; same statute, 3 *Ib.*, 5 ed., 181, § 71.) It is only in respect to the matters herein enumerated, that the accounting becomes conclusive evidence by statute. As respects any other matters, this provision does not operate to discharge the executor, but as to them, he is open to any remedies that may exist against him. (Bank of Poughkeepsie *a.* Hasbrouck, 6 *N. Y.*, 216.)

The petitioner insists that some of the items erroneously allowed do not come within either of the four subdivisions above enumerated, and that, consequently, she is entitled to have a re-accounting as to them. But, if there· be any such items, the accounting is, as to them, as conclusive in this court, as it is in respect to items embraced within the statutory provision. An accounting in a spiritual or ecclesiastical court was little else than a preparatory proceeding to gain some insight into the state of the fund, for, if brought by a creditor, the court had no power to decree the payment of his debt, or if brought by a legatee or next of kin, though the court could entertain a suit for a legacy or for the distribution of the residue of an estate, yet as it had no means to ascertain the. amount of the debts, it could not afford an effectual remedy. It was, in fact, as Lord Keeper North called it, a lame jurisdiction, and consequently the creditor had to sue at law, or the legatee or next of kin to bring a suit in equity, and neither at law nor in equity was any regard paid to the accounting, if one had been had in the spiritual courts. The Court of Chancery, on bill filed for the payment of a legacy or for distribution, would order an accounting as if none had taken place (Bissell *a.* Axtell, 2 *Vern.*, 47); and at law, the account as allowed by the ordinary, could not be given in evidence (Turvie's Case, 2 *Rolle's Abr.*, 678). The accounting, however, in the spiritual court, was conclusive there, for if, after the investigation of the account, the ordinary found it to be true and pronounced for its validity, and all the parties interested had been cited, the sentence was final, and the executor or administrator could be called to no further account. (*Oughton's Ordo Judiciorum*, 354–6; *Swinburne on Wills*, Lond. ed., 865; 4 *Burns' Ecc. Law*, 9 Lond. ed., by Phillimore, 605, 609; Rainer's Case, 1 *Deane's Ecc. R.*, 317.) Our statute, however, has made the final settlement of the account, and the allowance of it by the surrogate, conclusive evidence as to certain facts against creditors, legatees, next of kin, and all other persons in any way interested, upon whom the citation has been served, and of which the executor may avail himself, whether prosecuted here or in a court of law or in equity. As to other facts or items, it is conclusive here, at least so far as the right exists to compel an account, though it would be of no avail to the executor or administrator in another

forum. (Wurts *a.* Jenkins, 11 *Barb.*, 546; Bank of Pough-keepsie *a.* Hasbrouck, 6 *N. Y.*, 216.) Whether it would be here or not on an application to compel distribution is a question upon which it were better that I should express no opinion, as, should it arise, it may be examined hereafter.

It is insisted next, that both as respects the items which are embraced within this provision of the statute, as well as those which are not, that the account is not conclusive against the petitioner, inasmuch as she was a minor at the time when the accounting was had; and that though she may have been present in court, and have had a guardian *ad litem* to look after her interest, still that she is entitled either before or after her majority to have a reaccounting, if she can show that any item has been erroneously allowed, and that the allowance of it is prejudicial to her interests.

· In courts of equity the practice exists, where the effect of the decree is to devest the infant of an interest in land, or where a conveyance is required of an infant, and in cases of foreclosure (Miller *a.* Dennis, 3 *Johns. Ch.*, 367; Wright *a.* Miller, 8 *N. Y.*, 9, 18; *Dan. Ch. Pr.*, 1 Am. ed., 132, 133), to give him a day after he comes of age, to show cause why the decree should not be binding upon him; but in all other cases, as a general rule, he is, where a guardian *ad litem* has been appointed to act for him, as much bound by the decree as an adult. (Woodham *a.* Moor, *Tothill*, ed. of 1649, 108; Wall *a.* Bushley, 1 *Brown's C. C.*, 484; Sheffield *a.* Duchess of Buckingham, *West.*, 684; 1 *Atk.*, 631; Shield *a.* Power, 29 *Miss.*, 315; Alexander *a.* Trary, 9 *Ind.*, 174; Creath *a.* Smith, 20 *Miss.*, 113.) The rule in equity is, that the infant is bound by the acts of his guardian *ad litem*, if he acts *bona fide.* (*Dan. Ch. Pr.*, 1 Am. ed., 132.) A decree confirming or avoiding a will where an infant is heir or devisee, is conclusive upon him unless the court should give him a day to show cause, which is now no longer given (White-church *a.* Whitechurch, 2 *Eq. Ca. Ab.*, 303; Thornton *a.* Black-burn, 2 *Keb.*, 7; 1 *Harrison's Ch. Pr.*, ed. Newl., 367, *note*); and in a court of equity the accounting, which is had preparatory to a decree of foreclosure, is equally so, and the infant, if a day has been given to him to show cause, is limited to showing errors in the decree. (Mallock *a.* Golton, 3 *P. Wms.*, 350; Bennett *a.* Haniel, 2 *Sch. & Lef.*, 566.)

In the exercise of the ample powers with which courts of equity are clothed, they have in certain cases, where injustice has been done to the infant, by a decree afforded him relief, after he has come of age, by a rehearing or by a bill of review; but, as I have already stated, no such procedure was known in the ecclesiastical courts. In the State of Indiana, Probate Courts are clothed by statute with all the powers of a court of chancery in the matters submitted to their cognizance; and a distinction is made between a proceeding which is for the benefit of infants and one which is against them. In the former case they are concluded by the acts of the guardian *ad litem*, unless he is shown to have acted in bad faith; but in the latter, they may open the decree at any time within one year after they arrive at mature age by filing a petition for a review (*Act organizing Probate Courts*, Feb. 17, 1838; *Rev. Stat. of Indiana*, 174, ch. 24); and unless, as in this instance, such a power is given by statute, I know of no authority for its exercise by courts of this description.

In the earlier works upon the practice of the ecclesiastical courts, some doubts appear to have been entertained as to whether infants could be affected at all by the final accounting of an executor or administrator. In Cockburn's Clerk's Instructor (Dublin ed. of 1753, 288), it is said, "minors cannot be prejudiced by it, but may call executors to account; though it is the opinion of some that minors above seven years may be called to constitute a proctor, and pray that guardians or curators may be assigned them, and if they do not do so, all acts in pain of their contumacy will be valid. And it is also held that the judge, from his office, may assign minors, under seven years of age, guardians, and if he does that the acts done in their presence are good, but *quere*." In the Clerk's Instructor, however, a contemporary and far more reliable work, the forms are given by which infants, in electing a guardian *ad litem*, bind themselves to allow as firm and valid whatever the guardian might do or cause to be done in the premises. (*Clerk's Instructor*, ed. of 1740, 184.) In the subsequent works which I have consulted, no allusion is made to the doubt expressed in Cockburn, nor is there any reference to the subject; for accounting in these courts, after the Court of Chancery came to exercise a co-ordinate and more effectual jurisdiction, became exceedingly rare.

(See the remarks of Sir John Nicholl in Young *a.* Skilton, 3 *Hagg. Ecc. R.*, 782.) Little weight, however, is to be given to the doubt entertained by this early writer, as the practice of the Court of Chancery upon this subject was not settled or very clearly defined at the time when his work was published. The opinion of Sir Joseph Jekyl, in 1722, as to the cases in which the court would give an infant a day to show cause, after he became of age, was in direct conflict with that of Lord Hardwicke in 1737 (Eyre *a.* Countess of Shaftesbury, 2 *P. Wms.*, 103; Sheffield *a.* Duchess of Buckingham, *West*, 684); and perhaps the subject may be still open to some controversy, but the more general rule in courts of equity is as I have stated it.

Our statute has declared that the final accounting shall be conclusive against creditors, legatees, next of kin, and all other persons interested, and I am in effect asked to add to these words, " except in the case of infants." I do not feel at liberty to do so. The Revised Statutes contain numerous provisions designed for the protection of infants, and if the revisors, or the Legislature by whom the Revised Statutes were passed, had intended that this final settlement should be of no effect as respects infants, I think they would have said so. It is argued that they made no provision for the citation or the representation of infants upon this accounting, and that the omission to do so indicates that the accounting was not to be conclusive as to them. There is, however, a general provision, where the executor or administrator desires to have the account finally settled, requiring the surrogate to issue a citation to the creditors, legatees, and next of kin to attend at the settlement. (2 *Rev. Stat.*, 93; 5 ed., vol. 3, p. 180.) This has been always understood as including infants, and the practice has been uniform in this court, and I apprehend in every other Surrogate's Court in the State, to cite them and appoint guardians *ad litem* to watch over their interests. Provision is also made that an executor or administrator may be compelled to account by a person on behalf of any minor having a demand against the personal estate (2 *Rev. Stat.*, 92; 5 ed., vol. 3, p. 178), and it was not necessary to provide in the article upon accounting, for the manner in which infants should be represented, as the surrogate is—as has been already shown—clothed with ample power to appoint guardians *ad litem* to act in all cases on their behalf.

The provision declaring that the final accounting shall be conclusive, embraces the matters in respect to which an executor or administrator is usually required to account; and as respects matters not embraced within its provisions, the passage from Cockburn shows that in his time the opinion was entertained, that if the court appointed a guardian to look after the interests of infants, the acts done in his presence would be binding upon them; and it appears to have been subsequently the established practice of these courts to appoint guardians for infants in all cases where their interests might be affected, and they were required in the citation to appear by guardian. (Turner *a.* Felton, 2 *Phillim. Ecc. R.*, 93; 4 *Burns' Eccles. Law*, Lond. ed., by Phillimore, 151; 1 *Brown's Civ. & Adm. Law*, Am. ed., 454.)

If the final accounting is to have no effect upon the interests of infants, then it would seem to be entirely unnecessary to appoint guardians *ad litem* to look after their interests; nor could the distribution of assets, to which the accounting is preliminary, be final, if an infant, though represented upon the accounting, is at liberty at any time afterwards to have the whole account readjusted; matters would remain in the greatest uncertainty, and infinite difficulties would be created if this settlement is liable to be opened in every case where an infant was a party at the time of the adjustment. It is the duty of courts to see that the rights of infants or minors are protected; and that duty is discharged in any suit or proceeding, by appointing capable and disinterested persons to appear for them and watch over their interests. If they do not act *bona fide*, or if there is any fraud or collusion, any deception or surprise upon the court, the infant is entitled to have the decree set aside; but to go beyond this, and hold that infants are not to be affected by any proceeding, that they have the right in all cases, at any time afterwards, to have the settlement opened and readjusted if they can show that any item has been erroneously allowed, is in my judgment to carry the duty of protecting them to an unreasonable extent. If an executor or administrator is never to have a final settlement of his accounts, or be discharged from his trust as long as there is an infant still in his minority—if he must wait, say for twenty years or more before he can hope to be finally discharged, then I apprehend that few would be willing to undertake the administration of

such a trust. As I have said, if any fraud or collusion has been practised upon the accounting, relief should undoubtedly be given, for it cannot be that the statute meant that it should be conclusive in such a case, but with that exception, if all the parties in interest have been duly cited, and infants are represented in the mode established by law, I see no reason why it should not be conclusive and final.

It only remains to determine whether fraud or collusion has been shown in this case, and after fully considering the evidence, I do not feel that I would be justified in opening the account upon the assumption that that has been established. The facts alleged in the petitioner's affidavit, and which would mainly tend to show it, are denied in the affidavit of the executors, and neither the items alleged to have been erroneously allowed, nor the other circumstances set forth in the petitioner's affidavit, are of a character to warrant me in holding that fraud or collusion was practised in respect to the petitioner to get the accounts passed. Still the case is not altogether free of suspicion. The relation which the executor has held to the petitioner and to the estate is a peculiar one. He was a clerk to the deceased, and was appointed by the testator his executor in connection with the widow and another person. After the testator's death, he married the widow, by whom he has had three children. He alone, during the long period that has elapsed since the testator's death, has had the entire control and management of the estate, and the mother, for many years his wife, has been during this period the testamentary guardian of the testator's children, the petitioner and her brothers and sisters living with their mother and the executor as one family. Very serious charges against the executor in the management and discharge of his trust are set forth in the petitioner's affidavit, and not denied in the affidavit made by him; he relying chiefly upon a general objection to the want of jurisdiction in the court to call him to any further account, though his counsel, on the argument, gave an oral explanation of the matters set up in the petitioner's affidavit, which would seem to be satisfactory. Where the case is one of an infant placed under the circumstances in which this petitioner was placed, and she insists that she was deprived of her rights by fraud or collusion, the court should act with great caution, and afford her an ample oppor-

tunity if it is in her power to establish it. It is more especially so in the present case, as she has chiefly relied upon other grounds to be relieved from the effect of the decree, and in which my conclusions are against her. I shall have to decide against her on this ground also, deeming the evidence before me insufficient to sustain it; but I shall do so without prejudice to her right to make a new application, if she can bring facts and circumstances to the knowledge of the court which will satisfy it that there has been fraud or collusion on the part of the executor in obtaining the accounting.