The Subrógate.
The principal subject of examination in this matter has been the large claim presented by the administrator for one-half the net earnings of the steamship “ Daniel Webster.” This claim, if allowed, will exhaust the personal estate of the deceased ; and, if disallowed, there will be some twenty thousand dollars as the distributive shares of the next of kin.
The “ Webster” was purchased by the deceased on January 11, 1862, and chiefly earned the money which is the main subject of this controversey, under the management of the deceased, between that date and *432 October, 1866, when she was lost, while in the1 service of the United States, during the civil war. In order to establish the claim of the administrator, it became necessary that he should show, 1. That he was half owner of the ship, and as such entitled to half her net . earnings. 2. What those earnings were; and, 3. That the deceased had received the whole of .them. The . counsel for the administrator, as well as their managing clerk, iST. Dana Wells, Esq., have, with a view to establishing these facts, displayed great patience, perseverance and skill. They have establish ed a very large sum as the earnings of the vessel, and they have also .shown, quite conclusively, that the deceased received the whole of them. The serious difficulty they have .encountered has been in regard to establishing the interest of the administrator in the “Webster.” Of course, unless they have proven his title to half of her, the claim must fail. This they claim to have done by means of the letters which passed between the deceased .and the claimant on the subject, and the account books of the deceased. The facts chiefly relied upon are these :
In a letter written by the claimant at San Francisco . dated November 29, 1861, to the deceased in New York, he says, toward the close of it, “Buy the ‘ Webster ’ for my account, and send her out.”
Apparently, in reply, the deceased in a letter of January 28, 1862, says, sixty thousand dollars is the price Commodore Vanderbilt asks for the “Webster,” . and considers it a large price to pay for her, and continues, “but if I had nothing else to do, she would be a cheap ship at thirty thousand dollars. Now if she is chartered for thirty days,” at one thousand dollars • per day, “I would then have the ship for about thirty-six thousand.” Subsequently, in the same letter, he . says, “ I have just closed the purchase of the ‘ Daniel ;Webster ’ at forty thousand. I expect to charter her *433 at nine hundred per day. I take possession on 11th Inst. You shall have one-half of her if you say you want it. Send me all the spare funds you can spare of your own or mine. She is an old ship, but two years younger and the same size as the Pacific.” . . . “ If I find I can not charter her I will send her around to you. If Jim Huntington wants one quarter, and take charge of her, send him on.”
The deceased wrote again to his son, a letter, dated •“Wright’s Island” (L. I. Sound) January 10, 1862, in which he says, “I wrote you yesterday by overland mail; I also telegraphed you that I had bought the 6 Dan Webster.’ I am in hopes to get a charter for her. If you want one-half of her you can consider it yours. I wish you had her out with you.” . . . The next day, in the same letter, he says, “January 11. To-day I take charge of CD. Webster,’ got steam on, going round to East River to lay, send me on all the money you can spare.” . . .
He again writes, February 17, apparently in reply to a letter from the claimant to him, under date of January 20, in which deceased said he would not sell “an interest in the ‘Dan. Webster’ to John T. W., •Jr.” . . . “Mr. J. Brown I should not object to, •but we do not want any more owners in her ; we can .afford to own her for ourselves. Had they the money to put down I would think about it.” It would, therefore, seem, that George had proposed the conveyance of an interest to John T. Wright, Jr., and J. Brown, or one of them.
The letter next in evidence is one from George S. to his father, dated “ San Francisco, February 10, 1862,” in which he acknowledges having just received his father’s letter of January 10, 11, and says: “The ‘Webster’ would do well there” (China), “in fact ;any steamer that can yet there will make money. I hope through Mr. Eldredge’s assistance that we will *434 get rid of the ‘ Herman,’ as she is too large a ship for us. I note what you say about if I wish to take half of the ‘Webster ’ I can do so. I except (accept) your offer and will consider half of her mine from the day you bought her, and if I only have a little luck, will be able to send you some funds on account of it; however, if we sell the ‘Wright ’ I will have it. Please let me know what she cost you.”
Again, in a letter of February 21,1863, he says: “I note what you say about me taking an interest in the ‘ Webster,’ and I now say I take one-half of her from the day you bought her. I note what you say in regard to shipment of money. When I have any I will send as directed by you.” . . .
There is no further evidence of correspondence until October, 1866, a period of more than four years, when George writes, among other things,- to his father, “By a telegram from Messrs. Moody & Telfair, I learned of the fate of our good steamer the ‘Webster.’ I am sorry she has gone, for she has been a good and faithful servant to us. I see she was insured but for thirty-five thousand dollars, which I was sorry to hear as you generally had moré than that amount on ; however, that is better none.”
The next is a letter from the same, dated at “Victoria, V. I. November 10, 1866,” with copies of telegrams to Moody & Telfair, in relation to collecting the insurance money.
Next, is a letter from George to his father, dated at San Francisco, March 39, 1867, in which he says: “ ... Father, I wish you would let me know whether you have made a will or not, and if you have not I hope you will at once; let me know.” . . “Did you get paid for coal on ‘D. Webster’ from government, and the other claims ? Did Monroe get anything for us \ ” . . .
The last letter is from the same to the same, dated *435 “At sea/5 April 29, in which the writer again speaks of his father making a will, urging him to do so, and saying that he “anticipates trouble55 in case he should not. He also speaks of having found a “precedent for the claim of the 6D. Webster5 against the government/5 and after reciting it hopes that Monroe “will be able to use it as a precedent for ours.55
The claimant places great reliance upon an entry in an account book of deceased, containing an account of the disbursements for, and receipts from, the “Webster/3 under date of January 7, 1863, in the handwriting of deceased, in which he states the net earnings, and deducting cost of ship at one hundred and two thousand and seventeen dollars and fifty-six cents.
“ J. T. Wright, -I-, $51,008.78
G. S. Wright, -¡-, 51,008.78
$102,017.56.”
On a subsequent page of the same book is an estimate in decedent’s handwriting of the valne of his property, made in 1863. Among the entries are these : “-¡-of the 6Herman/ „ . $40,000
‘ Daniel Webster/ -¡- of her, $35,000, 60,000.”
These facts, to which should be added the testimony of the claimant, are mainly relied upon to establish this claim of about two hundred thousand dollars against the estate.
There is no evidence that George S. Wright ever forwarded to his father any money towards paying his share of the purchase money. He was half owner of the “Herman,” was most of the time at San Francisco and elsewhere on the Pacific coast, engaged in shipping business, and never had anything personally to do with the “ Webster,” other than to expend some money on her account, which will be alluded to hereafter. His father seemed to have the sole and entire .control and custody of her, and received, as it became *436 necessary for the claimant to show her entire earnings, and the thirty-five thousand dollars of insurance money.
It may be noted as somewhat remarkable that we have in evidence no correspondence between the father and son, relating to the “Webster,” or, indeed, to anything else, between February 20, 1862, and October, 1866,—-more than four years.
The title to the “Webster,” after her purchase, continued, at the Custom House in New York, to stand in the name of Cornelius Vanderbilt, until the early part of 1864, when it was transferred to George S. Wright, and continued to stand, and was insured in his name down to the time of its loss at sea. The charter parties from 1862 to 1864 were made in the name of John T. Wright, as owner, and afterwards in the name of the son. During the first period, the government officials gave their checks for the services of the vessel payable to the order of the deceased, and during the second period, payable to the order of George S. Wright, who endorsed them and handed them over to his father, and all were deposited with his bankers, J. & J. Stewart & Co., and he applied them to his own use.
The facts mainly relied upon by the next of kin to defeat this large claim, I understand to be, substantially, these:
1. Already shadowed forth, that the deceased had the exclusive charge, control, and management of the “Webster” ; that he purchased and paid for the vessel ; made the charter parties; received all its earnings and paid all' its expenses.
2. He had frequent settlements with the claimant, of accounts current rendered by him between January, 1862, when the ship was purchased, and 1864, on none of which occasions was there any consideration given to this vessel or its earnings, except that the claimant presented against the deceased, accounts of moneys *437 paid out by him for the ship, which were allowed and paid by the deceased. Other accounts current were subsequently rendered, which are not in evidence, and whose contents are not known.
3. So far as appears, no claim was ever presented, or demand made, by George S. Wright, for any portion of the earnings of the ship, at any time, although the deceased survived its loss upwards of two years.
4. In the book kept by deceased, known as his “memorandum-book,” and ££ledger,” marked A, at page 4, under date of October 1, 1863, he embraces, among items of property he is then worth, “Webster steamer, $60,000.” Again, on page 16, under date of January 1, 1866, he has an entry of “ Steamer Dan W.” (the “Dan” partly erased), “$40,000.”
It is worthy of remark that, while he clearly was the owner of one-half the “Herman,” and two-fifths of the “Vixen” only, in making these estimates of what he was worth, he invariably estimates those respective parts, while in no instance does it appear that he estimated one-half of the “Daniel Webster,” or any part short of the whole, other than as he seems partially to have done so in a sort of provisional way when he inserted the words and figures, “£ of her $35,000,” in the manner above referred to.
5. The oral admissions, proven to have been made by the claimant, since the death of his father.
Mr. Williams, who had a power of attorney from Wm. P. Wright, one of the next of kin, authorizing him to collect his share of the estate, testifies that he had various conversations with the administrator, commencing in 1871; that in the fall of 1873 he stated to the witness that, at that time, there was about one hundred and eighty-five thousand dollars of money on hand to be divided among the “heirs ’’ (next of kin), exclusive of real estate, and promised to pay him William P.’s share in January following. He said his *438 share would be eighteen thousand dollars or twenty thousand dollars.
Charl.es C. Jones, also having a like power of attorney from William P. Wright, testifies that George admitted to him in December, 1873, that William P.’s share would be eighteen thousand dollars or twenty thousand dollars, and that, at the same time, he paid him a draft of six hundred dollars, which Wm. P. had drawn on him.
Charles C. Fleming testifies that in 1869, with a power of attorney from Wm. P. Wright, and also from Mrs. Fleming, he called upon George, and that George stated to him the estate would amount to from four hundred thousand dollars to five hundred thousand dollars, and would divide about forty thousand dollars apiece. He also testified to various conversations on the subject, one of which is referred to in the letter hereafter quoted from, written by the administrator to' John Fleming, his brother-in-law, under date of March 6, 1870, and he then said, among other things, when the witness asked for an advance- to William P. of seven thousand dollars, he expected to close the estate soon, and “William will get his money; let him wait.”
6. Written admissions by the administrator. On .November 18, 1868, he wrote his brother-in-law, John Fleming, “Father left no will, and I have applied and been administrator. His property will be divided to his children, share and share alike. How long it will take I don’t know. He has four steamers here, none of them doing anything.”
(These four steamers were the “Cumberland,” “Hew England,” “Francis Wright,” and “Mexico,” prabably.)
In a letter addressed to one of his brothers, dated Tinogg’s Heck, 1869, he says: . . . . “I have advanced Mrs. Campbell, besides the $12,000 I first ga> e her, $5,000 more, four thousand of it I have taken *439 a mortgage for, the other one thousand, her notes. She has run me almost crazy, but I have made up my mind I will not give her another cent. Her house is furnished and she is getting along, I believe, though I have not seen her in two weeks, but she is bound to be in a tight place soon, I think. Messrs. Foster & Thomson have advised me to put in a claim for the “B. Webster,53 which will amount to a good sum. I will do so, but if it is allowed, or whatever portion of it is, I will divide it as the estate is divided. It is only put in to keep Eliza from coming in in case of trouble.53 In ■another letter, addressed to his brother-in-law, John Fleming, dated at Throggs’s Heck, March 2, 1869, he ;says: “Eliza has given me a considerable trouble lately. I have been obliged to loan her on her house on the mortgage, $4,000, which she needed to fit her house up. I think now she will be able to get along. I want to try to keep her quiet until I get the estate divided, and then she can go to hell or anywhere else. I think from present appearances that the estate will close up at $20,000 apiece, may be more. It depends upon what the steamers can be sold for.35 In still another letter to the same, dated at New York, March 6, 1870, he says: . . . . “I seen your brother a few days ago. He came in to see me. Said William had written him to try and get money from the estate, six thousand, as he had made some purchases and the time of payment was at hand. I told your brother that I could not advance him that amount, but that I had written if he wanted one thousand for his immediate use he could draw on me for it.33
From same letter:
“Have Abbey sign receipt for the amount and send me on. On the other side of this sheet I send you the form of the receipt.53
From “other side of sheet53:
“Received from George S. Wright, administrator *440 of John T. Wright, deceased, the sum of $5,500 on, account of my distributive share of said estate.”
In writing to one of his brothers, under date of October 22, 1872, he says:.....“In regards the estate, John did not sign, so I have concluded to go on and settle, and the lawyers have sent out notices to all parties to be at the final accounting oE the personal property in about 60 days, as they all have to-have 40 days’ notice. I have put in ‘Webster account,’ which, if it is allowed, I will- divide equally with all hands so if none of the heirs raises any objections to-the account, it can be settled, and there will not be-any thing left for Eliza to fight for.”
It is proper to remark that “Eliza,” and “Mrs.. Campbell,” are the same person; that the decedent was a widower with ten children, and that “Eliza” was his housekeeper, by whom he had seven other-children, and who, after his death, claimed to be Ms widow. Had she been such, she would, of course, have been entitled to one-third of the personal estate, and her children to distributive shares. When these letters-were written, as I understand, that claim of hers was still in abeyance.
7. The practice decedent had of putting the apparent title to the whole, or a portion of his vessels, in persons other than himself.
The administrator testifies that his father owned two-fifths of the “ Vixen,” but had the whole registered in the name of “ George S. Wright,” as owner, while he was in entire ignorance of it until after the death of his father. The other three-fifths were said to be owned by other persons.
He also states that- his father was sole owner of the propellor “George S. Wright,” and that his father had her registered in the name of “ George S. Wright,” as-owner. The registered ownership of the “Herman ” and, “ Gussie Telfair,” did not represent the true owners..
*441 I have endeavored thus to array the main facts, on either side, against each other, and, after due consideration, I can not resist the conviction that the claimant has failed to establish this large claim. It is purely a question of fact, and the impression made by the evidence is the only guide to follow in such cases. The oral and written admissions of the claimant seem to me utterly inconsistent with his claim, and to completely overthrow the prima facie case which he has established, to say nothing of other strong points against the claim. It will be observed, by reference to the proofs, that the decedent was in the habit of making estimates of what he was “worth.” In every instance, he invariably estimates the one-half of the “Herman,” and two-fifths of the “Vixen,” and the whole of the “ Webster,” to which I have already alluded. It is true that, at the end of the first year of the ownership of the “Webster,” he makes a division, in figures, between himself and George S. Wright, of the net earnings of the vessel, and about the same time makes his usual estimate of what he is worth, putting down the “Daniel Webster, of her $35,000, 60,000,” which, of course, was more than the half, but from that period down he, in his estimates, claims the whole of her. And this may be said in reference to the half net earnings, as partitioned between himself and the claimant, that underneath, on the same page, were entries written with a pencil which have been almost utterly obliterated. So little is left as to render it impossible to ascertain what it was before erasure. By whom it was done, is left to conjecture, but if done by the decedent himself, I do not see that it would aid the administrator.
I think, in a case of this kind, and especially where a claim of such magnitude is presented by an executor or administrator, who has sole custody of the books of account, correspondence and documents relating to *442 the claim presented, that he should be held to the clearest possible proof of the claim. An air of suspicion naturally gathers around it, which must needs be dispelled before it can be allowed.
This administrator is an alert, shrewd business man. This is apparent from his appearance on the stand and from Ms letters, and especially those in which he urges his father to make a will. He knew that his father was afflicted with a disease which must prove fatal; he knew of the peculiar relations of “Eliza” to him, and hence in case of his death he clearly foresaw—“anticipated”—the trouble which came, and, therefore, advised and urged his father to make a will. Is it not fair to presume that, if he had a valid claim to so vast an amount against his father, he would have seen to it that it was liquidated, and closed during the lifetime of his father %
The explanation which he has given of the oral and written admissions made by him, are entirely unsatisfactory to my mind, and I can hardly believe that a person whose relations to his brothers and sisters were of no more cordial and self-sacrificing a character than ordinarily exist between such near relatives, should, from mere regard, be willing to share what may justly be considered a large fortune, claimed by him, among them. It ill accords with our notions of the selfishness ■of human nature. The claimant was eagerly pursuing fortune—making money seemed to be Ms great object in life. He could even express fears that the war of the rebellion would soon be at an end, and thus his prospects for money-making be dimmed. And yet it is soberly and seriously urged that he intended to divide the great sum of two hundred thousand dollars, which he claims clearly belonged to him, into ten equal parts, and bestow nine-tenths upon his brothers and sisters, scattered about the world and settled in life.
The conclusion I have reached upon this claim, I . *443 find myself unable to resist. The admissions and other evidence, which preclude the recovery of the claim, can only be reconciled with the facts established by the claimant on the theory, either that the deceased, because his son sent him no money to pay for his half of the “Webster,” or from some other cause, concluded to retain the whole of the vessel as his own, or that they had a settlement, between themselves, of'all matters relating to the ship, during the lifetime of the decedent. Whatever the secret may be, it is in the possession of him who holds the correspondence, books, and papers of the deceased.
The administrator, after the intestate’s death, became embroiled with “Eliza,” who set up a claim as the widow, and he, undoubtedly, under the advice of astute Counsel, originated this claim solely as an effectual mode of depriving her of the fruits of any victory she might expect to reap by the establishment of her alleged rights, well knowing that his claim was a mere pretense; and he then honestly intended, in case his object was attained, to divide the amount of the same, or so much as might be allowed, equally among his brothers and sisters. Some, if not all, of them were informed by him of the object he had in view and of his intentions, and he suggested to at least one of them what would result, if no objection should be made to his account. After the account, however, had been filed and some of the next of kin had prudently and wisely interposed objections, and the claim of “Eliza” as widow had been disposed of adversely, as I have been given to understand, the administrator, seeing, as he perhaps supposed, a chance of success, changed the character of his feigned attack upon “Eliza,” into a real one against'his brothers and sisters.
It results from the rejection of the claim made to the half net earnings of the “Webster,” that the administrator must be charged with the eleven thousand *444 seven hundred and twenty-five dollars and seventy-cents of the earnings of that ship, collected by him after the death of his father, instead of the half of it only.
The five thousand dollars represented by scrip of the Eleventh Ward Bank, standing in the name of George S. Wright, it seems to me, belongs to the estate. It was purchased by the decedent, evidently paid for by him, and was never delivered to George, but was-found, as is to be presumed, among the papers of the deceased after his death; the administrator testifying that he had no knowledge of it until after that event occurred. If it was intended as a gift, it is invalid as-such, upon familiar and well-settled principles.
The several items of credit in the schedule of the account “in gold,” for sums paid out for the maintenance, education, &c., of the decedent’s children, I am inclined to think should be allowed. It is true no vouchers are presented, but they are sworn to by the-administrator; the deceased at an early day sanctioned such payments; the children have been supported ; and there is no evidence that they derived their support from any other source. On the whole, I am inclined to allow all of the credits embraced in that schedule.
Schedules 0 and D show that the administrator has-paid out, for debts and expenses of administration, the-sum of thirty-one thousand one hundred and thirty-nine dollars and fifteen cents; while schedule A of property not inventoried, shows cash received by him to the amount of over forty-eight thousand dollars.. Besides, he has received, from time to time, very large-sums of money. It appears from the same schedule of the account that, in Hovember, 1868, he received inter - est on ninety-four thousand dollars in bonds ; in 1869, on eighty- two thousand dollars only; in 1870 and from January of that year to July, 1872, on forty-four .Ihinrnst dollars only; yet he charges himself m *445 ’Schedule “A” (Inventory), with these bonds at a valuation of one hundred and seven thousand nine hundred and thirty-four dollars. It does not appear that he ever sold a portion of them at any time prior to July, 1873, or, to the time of making up his account; nor does there appear, from the state of the account, any necessity for such sale. If, on his theory that the estate was largely indebted to him on account of the “Webster” claim, he appropriated fifty thousand dollars of these bonds, or any other amount, to his own ■use, or, indeed, if he so appropriated it in the absence -of any theory, then he should account for the interest. As the matter stands, he must so account. There may ■be some question as to his liability for other interest money, in consequence of his mingling the funds of the estate with his own; but I have no sufficient data which will enable me to arrive at a satisfactory result.
OlarTcson N. Potter, for administrator.
Alex. Thain, for Wm. P. Wright and Abby J. Pleming, next of kin.
George Morris, for John T. Wright, next of kin.
I have thus endeavored to dispose of all the questions submitted to me in this matter. At the same time, it is possible that something, involved in the intricacies of the case, may have escaped my attention. If so, I will hear che parties in reference thereto, when they come before me to settle the decree, which must be prepared in accordance with the views above expressed.
I will also, at that time, dispose of the question of uosts and allowances, about which the parties may wish to be heard.
II. September, 1875.—Application to re-open the accounting.
*446 The Surrogate.
Since the above decision was. made, this matter has assumed a very remarkable phase.
An application is now made by the administrator,, based upon a petition and accompanying affidavits, to. re-open the case and permit the administrator to furnish evidence of the payment by Mm, to the next of kin, of various sums, from time to time, on account of their distributive shares, amounting in the aggregate to one hundred and fourteen thousand four hundred and thirty-four dollars and five cents. The petition states no ground for the application, and the only ground in which there is any force, is stated in the affidavit of the administrator, where he alleges that he did not know it was necessary to include in the account the payments made by him to next of kin.
A schedule containing the alleged payments, with, date of each payment, and to whom ma.de, accompanies the petition. The form of the vouchers taken for these alleged payments, judging from the specimens I have seen, is substantially as follows:
“Received of George S. Wright, administrator of John T. Wright, deceased, the sum of $ on account of my distributive share of said estate.”
The first question to be considered is, whether this court has any power to grant the application. The relief sought is, it strikes me, analagous to granting a. rehearing of a case submitted and decided, or a new trial after verdict. J adge Balt has ably summarized the powers of such courts as this, and I quote from his able and celebrated opinion, upon the point under consideration here.
Surrogates’ courts have power to “undo what has been done through fraud, or upon the supposition that they liad jurisdiction, or on the assumption that a party was dead who is living, or that there was no will or they may open decrees taken by default, or correct mistakes, the result of oversight or accident, and in *447 this state revoke the probate of wills or letters of administration or of guardianship in the cases provided for by statute. These are all powers existing of necessity, and indispensable to the administration of justice, under which may be embraced any other exercise of jurisdiction of a like nature or character. But when, as ■in this case, all the parties in interest have been represented at the hearing, and the court has given its final sentence or decree, I know of no authority showing that these courts have ever exercised the general power of opening and reversing it again, upon the ground that they had erred as to the law, or had decided erroneously upon the facts.”
£6There is,” however, “in ecclesiastical courts, what is known as ‘rescinding a conclusion.3 After the case is ended on both sidés, and the court has'given its conclusion upon the facts, a motion may be made to it to rescind the conclusion and allow the party applying to submit additional evidence. It is allowing the party against whom the conclusion operates to supply evidence, the want of which or insufficiency of which is indicated in the opinion or conclusion of the judge, such as when the proof of the identity of a particular party is not sufficient, or there is any other defect in the proof, the want of which is pointed out by the judge, which application is granted or not, in the sound discretion of the court. It may be made before publication (when the depositions are completed, and a day fixed for the hearing); but if made after, the party must show that the facts came to his knowledge afterwards ” (Brick3 s Estate, 15 Abb. Pr. 12, 36, and cases cited. See also People -o. Justices of Chenango, 1 J. C., 180).
In the case of Dobke v. McClaran (41 Barb., 491), the court says, that the power to open a decree, founded in misapprehension or mistake, and re-hear the matter upon the merits, is incident to the statutory power to take proofs and hear and determine the contention, *448 and the exercise of this power may be necessary to prevent the greatest injustice; ” and Sutherland, J., declares that motions for such purposes should be viewed with suspicion; and in the same case, Leonard, P. J., announces that he is unable to find any authority for granting a re-hearing in a case before the surrogate, when it has been regularly heard and submitted on the merits.
The strongest case for the administrator which I have been able to find, is that of Campbell v. Thatcher, .54 Barb., 382. It is, as to some of its facts, very similar to this; but in the essential ones, bearing upon the point under consideration, quite different. In that case the executors handed over their vouchers to counsel for the preparation of the account. Among them was a receipt for five hundred dollars, paid to a legatee. The counsel, by an oversight, omitted to credit the executors in the account for the five hundred dollars. The error was not discovered until the account was presented, and then, believing, and relying upon the belief, that the amount would be allowed to them on the balance known to be in their hands, going to the person who received such money, they did not ask to have the account corrected, but allowed the error to •pass. The surrogate allowed the decree to be corrected :and the supreme court sustained his action, on the express ground that it was a mistake or oversight, and .as such, bringing the case within the scope of the surrogate’s powers, as defined by the court in Brick’s Estate; of which case it spoke in terms of strong .approval. Indeed, the opinion in that case is often referred to by our ablest jurists and its doctrines, in ■reference to the extent and limitations of the jurisdiction of surrogates’ courts, emphatically endorsed. I think Judge Leonard was perfectly correct in saying that no case can be found showing that the surrogate .has power to grant a re-hearing in a case like this.
*449 The legislature of this state, however, by an act passed in 1870 {Laws of 1870, p. 836, § 1), conferred upon the surrogate of the county of New York the ■same power to set aside, open, vacate, or modify the orders or decrees made by him as is exercised by courts of record of general jurisdiction: Upon no other surrogate in the state has such power been conferred by legislative enactment.
It may be proper to say here, that a decree, taken by default, even, will not be opened except on the application of some one who will be injured if the decree, taken in his absence, is permitted to stand, or unless there be some plain and palpable mistake or error to which the attention of the court is called.
In a case such as this, the court of chancery being a court of record having general jurisdiction, could, in its discretion, grant a re-hearing. In the courts of ■common law, having like jurisdiction, a new trial could be granted in case of error in ruling by the judge, or misdirection of the jury by him which might have influenced the verdict. Whatever could be obtained in those courts by a re-hearing or a new trial, was obtainable in the ecclesiastical courts only by an appeal. Surrogates’ courts, with the single exception above referred to, are not courts of record, and are of inferior and not general jurisdiction. They possess no more power to set aside a decision upon the merits, and grant a re-hearing, than the old courts of common pleas or general sessions had to grant new trials. The ■supreme court, to which the appeal lies from this court, may, if it think fit, receive additional evidence, which it is said to have done on appeal from the surrogate’s decree, in the case of Ferrie v. Public Administrator (4 Bradf., 28; 23 N. Y., 90); or it may, I apprehend, send the case back to this, as an inferior court, ■with instructions to re-hear it (Devin v. Patchin, 26 N. Y., 441, per Balcom, J). The chancellor received *450 additional evidence on such appeals in the cases of Van Wyck v. Alley (1 Paige, 552), and Case v. Towle (8 Id. 579). This power of the appellate tribunal is questioned in the case of Devin v. Patchin, on the ground that the court can no longer follow the course of the civil law, since our statute was enacted, regulating such appeals ; but, it seems to me, it may still exercise the powers it formerly did, if not prevented by some positive enactment or reasonable implication. But this is beyond my sphere to determine. If this court does not possess the power to grant the relief sought, nor the appellate court power only to affirm or reverse the decrees of surrogates’ courts, then it would certainly seem that some legislation on the subject is needed.*
*451 I am entirely satisfied, from a consideration of the authorities to which I have referred, that I have no power whatever to reconsider this case in any of its aspects, unless, indeed, some fraud, mistake, or error has been committed, of which the administrator has cause to complain, or unless there is ground to rescind the conclusion which I reached upon the merits of the case. In order to ascertain the situation of the matter in these respects, I propose to give a brief resvme of the history of the case.
The petition for a citation, with a view to a final accounting, was presented to this court by the administrator in the latter part of 1872. He filed a verified account of his proceedings in February, 1873. In the preliminary statement, contained in the account, he refers to “ Schedule E, hereto annexed,33 as containing an account of all moneys paid to next of kin. That schedule is as follows:
“No money has been paid to the next of kin of the deceased,33 signed “Geo. S. Wright, administrator.33 Objections were filed by the next of kin, who are represented by counsel in this matter, and testimony was taken from time to time, mainly in regard to the “Webster33 claim, of the administrator heretofore disposed of, until the case was finally submitted for the decision of the court in July last, and the decision thereupon made on August 5, following.
In February last, during the progress of the litigation, counsel for contestants, with a view to the introduction of parol evidence of the contents of a draft alleged to have been drawn by one of the next of kin upon George S. Wright, as administrator, for one thousand dollars, which was paid by him, gave written notice to the proctors for the administrator to produce, at the then next hearing, all vouchers for payments made to the next of kin on account of distributive shares. At the next hearing, the administra *452 tor not producing any such vouchers, proof was offered tending to show that the administrator had paid such draft, drawn on him as such, by one of his brothers. Subsequently the administrator, being examined, and taking it to be true that the draft was drawn as alleged, undertook to explain away the effect that might result from Ms having paid it, and testified, among other things, that he paid it out of his own funds. In Ms statement, annexed to his application in this matter, I perceive that tMs one thousand dollar draft, paid to O. E. Williams, for his brother, Wm. P. Wright, is charged as having been paid to him November 7, 1870, “on account of his distributive share of said estate ”! There was also a similar question about a draft for six hundred dollars, paid to 0. 0. Jones for the same brother, which is also contained in the statement. The form of a receipt for Mrs. Fleming, another of the next of kin, to sign, was also offered in evidence. It was in the hand-writing of the administrator, and called for an acknowledgment that she had received from him five thousand five hundred dollars on account of her distributive share of the estate. In my examination of tMs part of the testimony, in order to a decision of the matter, I looked at schedule “ E ” of the account,' to see if anytMng was claimed to have been paid to any of the next of kin, and found it contained the statement already recited. Throughout the case, upon this point, the administrator stoutly resisted the idea that he had, in any way, recognized the rights of the next of kin to any part of the assets of the estate by making any payment to them as such. And the large claim made by him showed that, if allowed, he would absorb the whole of the assets, and there would still be due to him upwards of five thousand dollars. The case was submitted to me on the part of the then counsel for the administrator, in an elaborate written argument. It was therein and other *453 wise claimed that the moneys the administrator had paid to Wm. P. Wright were mere loans or gratuities to a distressed or needy brother, and were not paid on account of his distributive share. The argument proceeded upon the theory, having in view the admissions the administrator had made, orally and in his letters, that while he had a just and legal right to the “Webster55 claim he would still, after it had once been settled in his favor, divide the amount equally among the next of kin, as a pure gratuity for which he would have the credit, but did not choose to do it upon compulsion. The impression which I derived from the account, the testimony and the arguments of counsel certainly was that he had made no payments to next of kin, but still held in his possession some two hundred thousand dollars of the estate. And now, having failed to establish his large claim, he comes here with vouchers, as he alleges, showing payments made by Mm as admimstrator to next of kin, on account of their distributive shares of the estate, amounting, in the aggregate, to upwards of one hundred and fourteen thousand dollars. These alleged payments were made at various times, as shown by his statement, from November, 1868, to August 25, ,1875. It was either proven before me, or it was alleged by counsel of the administrator, or both, that the form of the receipts to be taken by him for payments to next of kin, was prepared by Ms then counsel. In the present application I fold it stated in the affidavit of Mr. Thomson, submitted among the papers, “that deponent first became informed in regard to the said payments, and their number and extent, during the pendency of the litigation before the surrogate, arising upon the said account and during a late period thereof, but not even then of the said schedule “E.” He does not swear that he did not know of any such payments having been made, or of the existence of any such vouchers, *454 prior to the making and filing of the account. That account was on file for more than two years before the case was ultimately decided, and, doubtless, during all that period, the administrator’s counsel were in possession of a copy of it. It would, therefore, appear somewhat strange that they should have had no knowledge of schedule “E.”
It is also a little remarkable that no one, to judge from the affidavits, is responsible for that unfortunate ' schedule.
Taking into consideration the fact that George S. Wright held what might fairly have been considered sufficient evidence to establish the “Webster” claim, while, at the same time, he held vouchers for payments made to next of kin to the amount of upwards of one hundred and fourteen thousand dollars, it is quite apparent that two divergent courses to pursue were open before him. One was, to press the “Webster” claim, and ignore the payments to next of kin, as calculated to injure the prospect of recovery, and as a matter of ■ no consequence in case of success; and the other, to claim the credit for payments to next of kin, and thus, ending the “Webster” affair, settle the estate as it should have been settled. The former conrse would seem to have been adopted.
Of course, the administrator can not allege that he is the victim of any fraud in the premises; nor can he allege the commission of any error or mistake on his part, on the part of the opposite parties, or of the court, so far as the facts show. A mistaken line of policy may have been pursued; but from such a mistake, however disastrous in its results, this court is powerless to relieve. He was in the hands of skillful counsel, who had acted as counsel for his father; they had prepared the form of voucher to be taken; he or they received the vouchers into his or their possession as they were taken, before and during the litigation; *455 they fail to show any mistake or error of fact on their part, and Mr. Thomson admits that he knew of the vouchers before the litigation closed. George S. Wright had a certain knowledge of them, nor does he pretend to deny it. I am satisfied that the fact of these payments having been made was purposely suppressed.
As an instance of the fallibility of human evidence, where large interests are at stake, I call attention to the facts, that my decision of the case was made August 5,1875; that George S. Wright, in his affidavit in this matter, sworn to September 4, testifies “that on August 2, 1875” (in time to have stayed the decision), “deponent for the first time learned that he had signed his name to a schedule, therein called schedule ‘E,’ containing the following statement:—£Ho money has been paid to the next of kin •of said deceased,’ ” and on September 6, inst., he made an affidavit before me in which he swears “that he never knew of schedule £E’ and its contents, until September 3, 1875; nor did he know of the same until his attention was called to the same by his counsel on that day.” Prom the facts and testimony in the case, I place no reliance upon the allegation of the administrator that he did not know it was necessary to include the payments to next of kin in the account.
When the fact of these payments to next of kin was, shortly after the decision of the case, disclosed to me, my astonishment was great, and whatever my own views or feelings, in regard to the course pursued, might be, I supposed I had the power, as a court endowed with a certain degree of equitable jurisdiction, to open the case and receive the evidence of these payments, and was then disposed to do so. At the same time, I further proposed to begin the matter de nono, and permit the contestants to file such further objections as they might desire. They now suggest that *456 they have further evidence which satisfies them that' if the decree be entered strictly in accordance with the decision already made, the administrator will still have the advantage. But, since I have examined the cases, cited, and finding as facts, that no fraud, error, oversight, or mistake has been committed, I am satisfied my power in the matter is spent, and I must, therefore, deny the application for a re-hearing ; nor can I rescind the conclusion already reached. In my opinion, I pointed out no defect of evidence relating to payments to the next of kin, for the very obvious reason that the administrator offered no proof of such payments ; nor is there any allegation made of the discovery of any new evidence since the decision.
I have carefully considered the authorities and statute referred to by the present learned counsel for the administrator in the case, in the brief submitted by him, but they do not alter my views as above expressed. It is but simple justice to him, to state that he is for the first time in the case on this application, and has no personal knowledge of or connection with the precedent proceeding. An order must be entered denying the application, but with leave to prove any payments made to next of kin, since the case was submitted.

 Since this opinion was prepared I have found that the learned commissioners, appointed to revise the statutes of this state, provide for the very difficulty suggested. In the first place they propose to Emit the power of the surrogate as follows :
§ 2289, subd. 11, provides that the surrogate shall have power “to proceed in aE matters subject to the cognizance of his court, according to the course and practice of a court having, by the common law, jurisdiction of such matters, except as otherwise prescribed by law j and to exercise such incidental powers as are necessary, to carry into effect the powers expressly conferred. But no surrogate’s court shall grant a re-hearing of any matter, once determined upon the merits, except where the decree or order made thereupon is set aside for some error not affecting the merits, or upon the appEcation of a party in default, who satisfactorily excuses his default.”
They next provide a remedy for cases which are thus placed beyond the surrogate’s reach, as follows:
“ § 2883. Where an appeal is taken upon the facts, the appellate court has the same power to decide the questions of fact which the surrogate had ; and it may, in its discretion, receive further testimony and documentary evidence, and appoint a referee.
“§ 2384. The appellate court may reverse, affirm or modify the decree or order appealed from, and every intermediate order which it is authorized by law to review, in any respect mentioned in the notice of appeal, and as to any or all the parties ; and it may order a new trial or hearing.”