Coffin, Surr.
Application having been made to this court to naturalize Carl Gr. Harstrom, a foreign-born person, the question arose as to whether it was one of the courts designated by the statutes of the United States for the purpose.
By those statutes any court of record, having a *392 clerk and seal, and possessing common law jurisdiction, is invested with the power (U. S. R. S. 378, § 2165). Surrogates’ courts became courts of record in 1877, and they each have a clerk, who is designated “ clerk to the surrogates’ court,” and a seal. The only question, therefore, is, have they common law jurisdiction?
It is true that these courts are creatures of the statute, and can only exercise such powers as are expressly conferred upon them by statute, and such inci- . dental ones as may be necessary to the proper exercise of the powers and duties thus conferred and imposed. For instance, it is well settled that, acting within the scope of their statutory jurisdiction, they may adjudicate as well an equitable as a legal claim. But this, it may be said, is not a jurisdictional power, but a mere incident to it; that the statute alone defines their jurisdiction, and hence they have no common law powers; as if the common and statute law could not 'co-exist, or, as if the statute could not confer such powers upon them.
King Alfred is generally regarded as the father, or rather, preserver, of the English common law, having gathered together into the “Dom-bec,” after reducing "the Heptarchy to one united kingdom, all the various customs theretofore prevailing in the several kingdoms so united into one. During the reign of himself and the other Saxon kings, testamentary causes were cognizable in the kings’ courts of common law, viz. : the county courts, over which the bishop and the alderman, or sheriff, together presided. This so continued down to the conquest, and until the eighteenth year of the reign of the conqueror, when he, moved by a desire to strengthen himself with the papal power, or for some other reason, saw fit to separate the spiritual from the temporal associate, and' to confer sole jurisdiction over testamentary causes upon the ecclesiastics alone. In *393 the time of Blackstone, the jurisdiction of the ecclesiastical courts, in this respect, was divisible into three branches: 1st, the probate of wills; 2d, the granting of administration; and, 3d, the suing for legacies (3 Bl. Comm. 98). In all these matters they proceeded according to the course of the civil and canon laws (Id. 100). They could not compel executors or administrators to account (Id. 98); or enforce the payment of legacies or distributive shares (Id. 101, 2); or order the sale of real estate to pay debts (Id. 95); or appoint guardians for minors; or admeasure dower; nor had they any control over testamentary trustees, or trust-estates {Id. 87). They could punish disobedience to their decrees, only by excommunication ; but here, if that did not enforce obedience, the common law compassionately came to their aid, and on the facts of the contempt being certified to the king in chancery, a writ was issued out of the latter court to the sheriff of the proper county, directing him to take and imprison the offender in the common jail, until he should become reconciled to the church (Id. 101,102)* All of the above enumerated powers, which the ecclesiastical courts did not possess, were exercised by the court of chancery, and are now, by statute, conferred upon surrogates.
Originally the court of chancery, which is of very ancient institution, contained two distinct tribunals— the one ordinary, being a court of' common law; the other extraordinary, being a court of equity (Id. 47). Equity is the soul and spirit of all law; positive law is construed, and rational law is made, by it (Id. 429). It never acts against, but in assistance of, the common law, supplying its deficiencies, not contradicting its rules. While it must bow to the behests of statutes, beyond that its range is bounded only by reason and conscience. It gleans its principles of wisdom and *394 beneficence not only from the civil and canon, but also from the common law. Its power in this respect is very wide. Although there is a distinction known between the common law and equity courts, it does not operate the exclusion of the latter from jurisdiction to pronounce and apply the principles of the common law. It acts as assistant to, in concurrence with, or in exclusion of, the jurisdiction of the courts of common law (Fombl. Eq. 10 and c. n.). The essential difference, says BeaCkstone, between law and equity, principally consists in the different modes of administering justice in each: in the mode of proof., the mode of trial, and the mode of relief.
It would seem that before the conquest, the courts of common law had sole jurisdiction over estates of the deceased ; that a portion only of that power was taken from them and bestowed upon ecclesiastics, and that the remaining powers were subsequently exercised by the chancellor, and more recently by other tribunals. They, nevertheless,- had their sources in the common law. There is, I think, scarcely a power conferred by statute upon surrogates’ courts which does not spring from the same source, while the mode of its exercise is defined, regulated, and limited, by statute.
It was ordained by the constitution of this State, adopted in 1777, that “ the legislature of this State shall at no time hereafter institute any new court or courts but such as shall proceed according to the common law.” The prerogative court was abolished in 1778, and a court of probate was instituted, which was a new court (Brick’s Estate, 15 Abb. Pr. 12, 27). In 1787 the appointment of a surrogate for each county was provided for by an act passed in that year, and the power to grant probates and letters of administration was taken from the probate court, except in certain specified cases, and conferred upon the surrogates, whose jurisdiction has been, from time to time, enlarged *395 by conferring upon them common law powers, until they have now attained to the exercise of nearly all the functions formerly exercised by the chancellor and the law courts, relating to accountings, admeasurement of dower, enforcing decrees, appointment of guardians, the sale of real estate to pay debts, &c. By the twentieth section of the last named act, it was declared that “the courts of the said surrogates, and the said court of probate, in the matters submitted to their cognizance, respectively, by this act, shall proceed according to the course of the courts, having, by the common law, jurisdiction of like matters.” This proves conclusively that the legislature supposed it was, by that act, conferring common law jurisdiction upon these courts. It is certainly none the less such, because its exercise by them is authorized by statute.
I have deemed it unnecessary to trace the various channels through which these powers have been transmitted until they have become concentered in these courts ; the object was rather to briefly show that they possess all the requisites necessary to grant naturalization. Having reached the conclusion, that they do, they should not evade or hesitate to exercise them, when invoked, however onerous it may be.
I shall, therefore, proceed to naturalize the applicant, and such others as may present themselves for that purpose.

 See People v. Marshall, p. 380 of this vol., and cases there cited, and cases following this.